## OLSON CONST. CO. et al. v. UNITED STATES.

### No. 47265.

Court of Claims.

March 1, 1948.

JONES, Chief Justice, and LITTLETON, Judge dissenting.

David E. Fegan, of Washington, D. C. (Morris, KixMiller & Baar, of Washington, D. C., on the brief), for plaintiff.

Frank J. Keating, of Washington, D. C., and H. G. Morrison, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

MADDEN, Judge.

In this construction contract case the plaintiffs allege two bases of recovery: (1) That there was a mutual mistake and oversight in that the written contract failed to express the true intention of the parties and, as a result, plaintiffs were required to furnish more expensive insulation material than was contemplated, and therefore the contract should be reformed; (2) plaintiffs claim in the alternative that under the terms of the contract they were given an election

in the use of three types of insulation material; that defendant ordered plaintiffs to use only one, the most expensive of the three; and that since plaintiffs relinquished their right to use either of the two cheaper materials the defendant became obligated to pay the difference in cost.

On May 20, 1943, the defendant, acting through the Area Engineer, United States Corps of Engineers at Lincoln, Nebraska, issued a request for bids for the construction of a cold storage building at the airfield near Lincoln, Nebraska. Bids were to be received in the area office at Lincoln until 2:00 p. m., May 27, 1943, at which time such bids were to be opened. The award was to be made on the basis of negotiation and not necessarily to the lowest bidder.

During the period involved the plaintiffs were engaged in the construction business as joint contractors. They submitted a bid upon a Government standard form of offer just prior to 2:00 p. m., May 27, 1943, to the office of the Area Engineer at Lincoln, Nebraska. The bid was for a unit price for the construction plus a specific price per yard for concrete pavement, the amount of the latter being estimated at 2,422 square yards. The bid contained no qualification or request to change the specifications.

About May 25, 1943, the Baker Ice Machine Company and the D. K. Baxter Company decided to endeavor as joint contractors to obtain a subcontract to supply and install the insulation material and the refrigeration machinery from whatever contractor should be awarded the prime contract by the Government. It was decided by Baker and Baxter that bids and contracts would be made in the name of Baker Ice Machine Company.

The specifications were referred to in the invitation for bids, were attached to the invitation, and were made a part of the contract by reference. They contained the following:

"8–02 General.— * * * Rigid insulation shall be applied for cold temperature insulation as shown on the drawings. The rooms which are to be refrigerated to a temperature of 40 degrees or lower shall be insulated with compressed corkboard, celo-block or mineral wool moulded block. The 50-degree room shall be insulated with celo-block or mineral wool moulded block."

Celo-block was defined in paragraph 8–03 of the specifications as follows:

"(b)   Celo-Block.—Celo-Block shall be a product similar and equal to the material so trade-named, and manufactured by the Celotex Corporation and as otherwise approved by the Contracting Officer."

The celo-block was the cheapest of these three materials. The cost of mineral wool moulded block was 50 percent greater and corkboard was approximately twice as expensive as celo-block.

The Baxter Company examined the specifications which were attached to the invitation to bid, then contacted suppliers of insulation material and became convinced that Fir-Tex, a trade name for a certain type of insulation material equivalent to celo-block, could be obtained in time to comply with the contract. Accordingly, an official of the Baker Ice Machine Company telephoned to the plaintiffs on the morning of May 27, 1943, the amount of a bid price to supply and install the insulation material and refrigeration machinery. This information was also furnished to other prospective bidders. The Baxter Ice Machine Company prepared a statement of their proposal, including drawings, and as the time was short took it to the Area Engineer's office.

The bids were opened. The plaintiffs were the low bidders and they were advised about 2:00 p. m. on May 27 that the contract would be awarded to them. The Area Engineer's office inquired of plaintiffs whether their bid was based on the bid of the Baker Ice Machine Company. Receiving an affirmative answer, the statement of the Baker Ice Machine Company was then called to plaintiffs' attention. It contained the following:

"Relative to the room construction, we have based our bid on using corkboard in the floors, and celo-block or equivalent, in the walls and ceiling.

"If a contractor who is using our bid is the successful bidder, we will be glad to offer an alternate bid on using corkboard throughout, * * *"

The contract was signed by the contracting officer and by plaintiffs on the same date, May 27, 1943. No change was made in the language of the specifications, which were made a part of the contract by reference.

Within a few days it was found that neither celo-block nor mineral wool moulded block insulation would be available to the subcontractors in time for completion of the work within the 60 days provided by the contract. The Baker Ice Machine Company then asked plaintiffs for permission to use a semi-rigid insulation material known as Zero-cell in lieu of Fir-Tex. The contracting officer refused to accept the substitute. There was further discussion and it was agreed that, in the circumstances, the plaintiffs should use corkboard in the places where they had intended to use Fir-Tex. The subcontractor then put in the corkboard. The plaintiffs were instructed to prepare a cost break-down covering the increased cost of the insulation and submit it to the Area Engineer for appropriate action. This break-down was submitted on July 10, and showed an additional cost of $6,636.08, including 10 percent for overhead and profit. A proposed supplemental agreement was prepared by the Area Engineer's office on September 17, 1943. By its terms it stated that it would not be binding upon either the plaintiffs or the defendant until approved by the Chief of Engineers. It proposed to strike out the sentence specifying the three classes of acceptable insulation material and insert in lieu thereof a provision for compressed corkboard. The proposed agreement provided for an increase in the contract price of $4,318. This document was signed by the then contracting officer and by proper representatives of the plaintiffs. The supplemental agreement was not approved by the Chief of Engineers.

Subsequently plaintiffs' claim for additional payment in the sum of $4,318, based on the use of corkboard, was denied by the District Engineer. Plaintiffs appealed to the Secretary of War, who referred the matter to the Board of Contract Appeals in his department, which board denied the claim on October 25, 1944.

As we have said one theory of the plaintiffs' suit is that the contract should be reformed, and enforced as reformed, because, by inadvertence, the parties neglected to limit its provisions to the one material, Fir-Tex, which both parties intended to be used for the part of the insulation job here involved. That both parties did so intend, we have no doubt. Before the contract was signed, they examined and discussed the bid of the subcontractor which made clear what material he proposed to use. The understanding being thus clear, it was not unnatural that it did not occur to either the agents of the Government or the contractors, who were laymen, that there was any necessity for changing the writing. The Government had in writing invited bids, saying that either corkboard, celo-block (of which Fir-Tex was one variety) or mineral wool moulded block could be used for the part of the job here in question. The plaintiffs in response, which response included the communication of the subcontractor, had made a bid, saying that it was based on the use of Fir-Tex. All parties assumed that Fir-Tex would be used and that that was settled. They did not anticipate the difficulties which have caused this lawsuit. They understood each other and they had a prepared paper before them for signature. They signed it.

We have no doubt that if the subcontractor's proposal had specified corkboard, and the contracting officer's agent had said to the plaintiffs that he understood that their bid was based on the subcontractor's proposal and the plaintiffs had replied affirmatively, and the plaintiffs had later sought to use Fir-Tex, a much cheaper material, instead, the contracting officer would have objected that the plaintiffs were not doing what they had agreed to do and what they were being paid for doing. And we think that situation would have been entirely comparable to the one now before us.

■ When the invitation for bids, as in this case, stated that the contract was not, necessarily, to be let to the lowest bidder but was to be negotiated after a study of the bids, and permitted bids to be made upon the basis of the use of several materials differing greatly in cost, we think it

meant that the resulting contract should require the contractor to use the one of the materials upon which the bid and the negotiated contract would be based. We think it did not mean that the Government having made a contract upon the understanding that the costlier material would be used, would have to be satisfied with the cheaper material if the contractor repudiated the understanding and pointed to the option in the written words of the contract which had been written before the option was exercised and the contract made. Likewise we think it did not mean that the contractor could be required, without extra compensation, to furnish the costlier material, if the cheaper material agreed upon became unavailable.

The understanding and intention of the contracting officer's agents who made the contract for the Government is shown by the supplemental agreement which they prepared and sought to have approved by the Chief of Engineers. Their understanding and intention which was identical with that of the plaintiffs, is the important point in the case. When the letter of the contract, as signed, contained alternatives which, useful and rational in the negotiation stage when bids were being solicited, became obsolete and irrational as terms of a definite agreement, we think that the failure to strike out the alternatives did not indicate at all that they were intended to remain a part of the contract. It was an inadvertence such as honest laymen who expect to do what they agree to do are, probably, often guilty of. But one guilty of such a natural inadvertence does not lay himself open to being required, merely because of the letter of the writing, to perform what he has not promised. We think that, in the circumstances in which this contract was made, there is no rule of law which prevents the true agreement of the parties from having controlling effect, and that the contract, as written, when read against its background, means what the plaintiffs claim that it means. Plaintiffs are entitled to recover $4,318.00. It is so ordered.

HOWELL and WHITAKER, Judges, concur.

JONES, Chief Justice (dissenting).

We do not think that the facts of this case meet the requirements of a mutual mistake of such a nature as would authorize a setting aside of its plain terms. The specifications are very clear. They were attached to the invitation to bid and became a part of the contract without any request on the part of either party that they be changed. Olympia Shipping Corporation v. United States, 71 C.Cls. 251, 262, 263.

Undoubtedly there was conversation in the Area Engineer's office and it is altogether likely that plaintiffs calculated their bid upon the belief that Fir-Tex would be available within the time required. They evidently relied upon the information furnished by the Baker Ice Machine Company, but after all the conversations had taken place the plaintiffs signed a contract which obligated them to do the construction work and furnish one or the other of three different types of insulation material. When it became apparent that the first two types of material would not be available within the time required, and that the semi-rigid substitute would not be acceptable, the plain terms of the contract required that plaintiffs use the only other available material specified therein. This was done and the work of the contract was completed and accepted by the Government on August 3, 1943.

The local officers were not authorized to change the terms of the contract without the approval of the Chief of Engineers or the head of the department.

The facts of this case do not bring it within the pattern set out in the cases cited by the plaintiffs. Plaintiffs were unfortunate in that they relied upon the mistaken belief that the cheaper material would be available, but the defendant made no such guarantee. The plaintiffs obligated themselves to do certain work within a specified time with one of three different kinds of material. They did the work with one of the materials specified in the contract, and they have been paid the price stipulated in the written agreement.

The petition should be dismissed.

Judge LITTLETON authorizes me to say that he concurs in the foregoing dissent.