### MILLIMET CONST. CO., Inc. v. UNITED STATES.

No. 46130.

United States Court of Claims.

May 2, 1949.

Albert Foreman, of New York City (M. Carl Levine, Margulas & Foreman, all of

692

New York City, on the brief), for plaintiff.

Mary K. Fagan, of Washington, D. C., H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, HOWELL, MADDEN and WHITAKER, Judges.

LITTLETON, Judge.

■ Plaintiff entered into a contract with defendant March 10, 1938, for the remodeling of the Grand Central Annex Post Office Building in New York City, for a lump sum consideration of $1,849,000. The original period for completion of the work was 360 calendar days after March 24, 1938. The period so fixed expired March 19, 1939. The defendant took possession of the substantially completed work on April 14, 1940. The defendant was liberal in granting extensions of time. Extensions of time totaling 396 days were granted which extended the completion date to April 18, 1940. Of these extensions, 253 days were allowed under Article 3 in connection with changes (there were about 76 change orders issued), and 143 days were allowed under Article 9 on account of strikes and other conditions determined to have been beyond the control of the contractor or the Government.

Plaintiff alleges, among other things, that the Government breached the contract to its damage in numerous instances by unreasonably interfering with and delaying the progress of the work of plaintiff and its subcontractors for steel, electrical, and plumbing work, including the issuance of certain change orders for work which should have been anticipated when the specifications were prepared; by requiring plaintiff and certain of its subcontractors to perform numerous items of work as a part of the contract which involved extra work outside the requirements of the contract; by refusing to allow plaintiff to remove and keep as its property certain pneumatic tube equipment of the alleged value of $40,440, and by making an excessive deduction for the elimination of metal window louvers.

Plaintiff's claim for damages in the total amount of $133,715.54 is made up of the following items:

General interference and delay:

1. Plaintiff's excess office and job overhead expense, workmen's compensation, social security, etc., 160 days .................... $16,783.76

2. Steel subcontractor's excess overhead expense, etc., 25 weeks' delay on stage 1 work ................-....... 12,434.80

Loss due to inefficiency and lost motion of labor on steel work 12,151.35

Storage, lighterage, and special handling of steel due to defendant's failure promptly to move into stage 1 when completed ..................... 1,100.29

3. Electrical subcontractor's excess overhead expense 11,384.86

Loss on labor costs............ 12,733.00

Insurance and miscellaneous expense ..................... 1,400.63

Total on delay items.... 67,988.69

Plumbing subcontractor's excess costs for extra work, interference, and delay:

4. Insulation of hot water tanks 225.00

5. Lead pans for cornice drains 810.83

6. Removal of pipes below ground floor ............ 2,239.59

7. Occupancy by defendant's engineer of space in work area ................... 5,190.30

8. Flashings for roof drains... 70.65

9. Cleaning drains .......... 525.40

10. Changing pipes installed around elevator hatch.... 52.53

11. Temporary connections for drinking water ......... 262.70

12. Additional cost—lack of access to stage 2 during stage 1 work............ 2,889.15

13. Additional cost of maintaining plumbing in stage 1.. 1,751.35

14. Setting toilet facilities temporarily .............. 315.29

15. Removal of water main and meter ................. 733.00

Total of plumbing items 15,065.79

16. Pneumatic tube equipment value ...................$ 40,440.00
17. Extra work—acoustical material and labor.......... 2,093.72
18. Extra concrete work in vault light area .............. 1,734.17
19. Cost of temporary heating facilities ............... 5,643.17
20. Excess deduction for metal louvers eliminated....... 750.00

Total ................... 133,715.54

The essential facts shown by the record with reference to the nature of the contract work and to the interferences and delays of which plaintiff complains are set forth in findings 2 to 21, inclusive. The evidence submitted and our findings of fact thereon show that plaintiff's difficulties and delays were due primarily to the nature of the work; the general conditions under which the contract work had to be performed, which were anticipated by the contract and disclosed in the specifications and drawings; to delay in the delivery and erection of structural steel; to the failure of plaintiff to plan and co-ordinate its own work and that of its various subcontractors, and to certain conditions beyond the control of either party. Magoba Construction Co. v. United States, 99 Ct. Cl. 662.

The contract provided that the building was to be occupied by the post office during the life of the contract and that all work required under the contract should be carried on in such a manner as to cause no interruption to or interference with Government business. There were approximately 2,000 postal employees regularly working within the building during the remodeling, which force was augmented by about 1,000 temporary employees during the Christmas holiday period.

When plaintiff's evidence is considered and weighed in connection with the working conditions which were anticipated by the contract and which plaintiff should have anticipated; the delays which were caused by plaintiff; the delays which were not due to the fault of either party; and the reserved right of defendant to make changes in the drawings and specifications, such evidence falls far short of establishing that the defendant unreasonably delayed the work of plaintiff or that of its subcontractors, either generally or in connection with the issuance of changed orders; or, that defendant acted arbitrarily or delayed unreasonably in acting with reference to any matter concerning which it was required to act under the contract. See finding 22.

In view of the findings which fully cover the several items of delay upon which plaintiff bases its claim, and which show to our satisfaction that there was no breach of the contract by defendant, no useful purpose would be served by again discussing the facts here. The plaintiff is not entitled to recover on this phase of its claim.

The next claim of plaintiff is for $15,065.79 and is made up of 12 items relating to plumbing work listed above as items 4 to 15, inclusive. Plaintiff insists that these items involved extra work not required by the contract and that the costs incurred in connection therewith should have been paid in addition to the stipulated contract price.

*Insulation of hot water tanks.*—The essential facts concerning this claim for $225 are set forth in finding 62. This work was specifically required by the standard specifications for plumbing which were a part of plaintiff's contract. Plaintiff ordered its subcontractor to cover the tanks with the required material as a contract requirement. In this, it was correct. Plaintiff did not protest the statement of defendant's engineer that he would expect the tanks to be covered as required by the contract. No claim was made for this work as an extra. We find no basis for the claim now made that the job specifications by implication modified the standard specifications.

*Lead pans for cornice drains.*—The facts relative to this claim for $810.83 are set forth in finding 58. Where plaintiff's plumbing subcontractor constructed the downspouts for the drains he attached cast-iron roof drains without cutting back the lead gooseneck connection leading into the downspout pipes, so as to provide a flange, with the result that the roof was not watertight as required by the contract.

The contracting officer ordered plaintiff, after a dispute arose between plaintiff and its plumbing and roofing subcontractors, to make the roof watertight. The lead pans or gaskets, of which plaintiff here complains, were installed in order to prevent the roof from leaking. The work performed and the material furnished were clearly required, as shown in finding 58, by sections 28 and 46–2 and 46–11 to 13 of the job specifications and paragraph 61 of the standard specifications. Plaintiff did not protest the doing of this work nor did it make claim therefor as an extra.

*Removal of pipes below ground floor.*— The facts pertinent to this claim for $2,-239.59 are stated in finding 64. This item of work involved the removal of certain old pipes, from 2 to 16 inches in diameter, including fittings, some of which weighed between 800 and 900 pounds. These pipes were located near the "hung ceiling" under the old ground floor of the building to be remodeled, and served as connections for water and sewer outlets. New pipes serving the same purpose were to be, and were installed, in approximately the same locations as the pipes in question. Drawing 12 (showed the ground floor before remodeling, but did not show the details of the area underneath thereof) contained a note that "Unless otherwise noted all existing work not shown on Drawing No. 2 shall be removed." Drawing P—450 showed new plumbing work in the area where these old pipes were located. These pipes were not concealed. They were visible on inspection. The pipes, conduits, and ventilating ducts in the area described by addendum 7 to the specifications, were concealed in the "hung ceiling." Drawing 2, referred to in Drawing 12, did not show these old pipes as remaining, and indicated that the "Entire interior finish on this floor shall be removed—including * * floor finish and fill. And all mechanical equipment, plumbing, etc. * * *." Plaintiff could see from inspection that these old pipes would serve no purpose in the new arrangement.

When plaintiff was told that these pipes were to be removed by it, it declined to remove them as a contract requirement and demanded a written order, claiming that it was required to remove only the pipes within the area of the "hung ceiling," covered by addendum 7. In January 1940, some time after the work had been completed, plaintiff submitted a proposal for the cost thereof as an extra. This claim was rejected by the construction engineer and by the contracting officer. Plaintiff took no further action on its claim, until the filing of this suit.

We think the decision of the contracting officer was correct. Section 45–46(B) of the specifications (finding 71(9) (e) ) and Drawings 2, 12, and P–450, supra, were sufficient to put plaintiff on notice that these pipes were to be removed. We think it is clear that addendum 7 was only intended to put plaintiff on notice that certain concealed pipes, conduits, and ventilating ducts under the ground floor were to be removed. It described only the area of the "hung ceiling," and there is no conflict or inconsistency between the drawings and this addendum.

*Facilities for defendant's construction engineer.*—The facts relevant to this claim for $5,190.30 are contained in finding 61. Plaintiff says that occupancy by defendant's construction engineer, who was in charge of the work, of certain space, first, in stage 1 area while demolition and construction work in that area was being performed, and, later, in stage 2 before plumbing work in that area had been completed, caused the plumbing subcontractor extra costs for temporary plumbing facilities and maintenance expense outside the requirements of the contract. It is claimed that the engineer had no right to occupy space in the building, especially in an area where it was necessary for plaintiff to perform work, and that even if he did, plaintiff was not required to provide plumbing facilities for him.

The engineer was instructed to call upon the Postmaster and obtain from him a room in the building, since the contract provided that the building would be occupied during remodeling work. The Postmaster could not give him any of the post office space on the first or second floor, but gave him the custodian's office. The custodian moved out of the building into

quarters rented by the Government. Although the Government was not required to do so under the contract, the post office did rent outside space in a nearby building and moved three divisions of the service and a number of employees thereto. The office assigned to the engineer was a part of the post office functioning under the Post Office Department. See finding 9(2).

The construction engineer requested that water facilities be maintained in his office as a part of the contractual requirements for providing temporary facilities during construction. The plaintiff was then maintaining water lines for fire protection through this area, and the lines for the engineer's office were maintained at no additional cost to the contractor. In October 1938, the contracting officer moved to an office on the fourth floor in an area designed to become the new offices for the postal inspector. This was one of the first areas scheduled for completion due to its access to the pipe galleries.

In view of all the circumstances, we think this claim involves one of the reasonable conditions of the work contemplated by the contract. This was a large building and the remodeling work was extensive. It was occupied by the post office and many officials and employees. The proof shows that it was necessary that the engineer have suitable space in the building, to the end that he might properly supervise the work and perform the administrative duties necessarily incident thereto. In section 3 of the specifications it was provided in paragraph 21 that "The building will be occupied during the life of the contract hereunder. The work shall be so done as to cause no interruption to the Government business. The contractor shall provide satisfactory temporary facilities to permit all business to be continued during the operations under the contract." Paragraph 23 stated that the work of remodeling the building "shall be done in three stages as indicated on the drawings." Paragraph 24 provided that "All temporary facilities shall be adequate for the purpose intended and, in general, materials and workmanship shall conform with the requirements for

similar permanent work." Paragraph 26 called for the installation of toilet and water facilities in this area. The evidence does not establish that compliance with this request for facilities at that time necessitated any work out of the regular progress of the work in general, or that the request was arbitrary or unreasonable.

*Flashing on roof drains in court.*—The facts relative to this claim for $70.65 are set out in finding 59. The work involved in this claim was for the purpose of correcting defective materials and workmanship which left a leaking roof. The plumbing contractor installed cast-iron drains with integral flanges but placed no flashing between the flanges and the roof, as required by the specifications. Plaintiff did not protest the construction engineer's direction that the leakage must be corrected and the roof made watertight at these connections; it was not ordered as an extra; and no claim therefor was made until the filing of this suit.

*Cleaning cornice drains between pipe gallery floor and fourth floor.*—Finding 57 sets forth the pertinent facts concerning this claim for $525.40. Section 3–26 of the specifications required that "The contractor shall provide adequate protection for all parts of the building, and its contents and occupants wherever work under this contract is performed." The contractor, in the normal progress of the contract, was engaged in parts of the building where work was performed. The custodial employees of the post office cared for that part of the building which the post office occupied and plaintiff cleaned and maintained that portion in which it was working. Extensive work was performed in the area above mentioned where the clogged drains leaked through and damaged the walls. Plaintiff did not protest the doing of this work at the time or deny that it was required to do so under the contract. The claim has no merit.

*Changing pipes around hatch to pipe gallery.*—The facts as to this claim for $52.53 are stated in finding 63. We find no merit in this claim.

Section 45–18 of the contract provided that the plans were generally diagrammatic and that the contractor must harmonize the work of the different trades so that interferences between piping, equipment, architectural and structural work would be avoided.

Had the steel in this area been erected in proper time and without delay, the details would have been available, the interference discernible, and the cost avoided. The additional expense was due to the lack of co-ordination between the trades on the part of the plaintiff and lack of progress in the erection of structural steel by its subcontractor. No order was requested or authorized as an extra for this work.

*Temporary facilities and drinking water.*—This claim is for $262.70. As hereinbefore mentioned, the post office continued to occupy the building during remodeling, and adequate temporary facilities were required of plaintiff by the contract. The post office officers and employees had to have drinking water and plaintiff was required to furnish suitable facilities therefor. We can find no merit in this claim. See finding 56.

*Additional cost resulting from unreasonable denial of access to stage 2 during stage 1 work.*—This claim for $2,889.15 is based on alleged unreasonable interference and delay by defendant's post office officials. The item of claim has been disposed of in our decision on plaintiff's general claims for interference and delay. This claim on behalf of the plumbing subcontractor is not supported by the evidence. See findings 9(13), 21(iv), and 22.

*Additional cost of maintaining plumbing in stage 1.*—This claim for $1,751.35 is based on alleged unreasonable delay by the post office in moving from stage 2 into stage 1, on or soon after June 23, 1939. The plaintiff, for itself and on behalf of its electrical and steel subcontractors, asserted similar items of alleged costs under the first claim for interference and delay, which we have denied because such claims are not supported by proof that this delay was unreasonable under all the circumstances. See findings 10 (4) and 22. While it is true, as shown

in finding 10 (4), that the contracting officer, in August 1940, gave plaintiff an extension of time of 46 days based on the time used by post office in moving into stage 1 from stage 2, he was liberal in this allowance, and it is obvious that he was not passing upon the question here presented as to whether the delay was or was not unreasonable under the circumstances. If the work in stage 1 had been wholly completed at the time plaintiff claims the post office should have moved, and if other things had been normal, the delay would not have been more than 31 days. But such was not the case. As late as July 17, 1939, the defendant's engineer was urging plaintiff by letters to complete the work in stage 1 by correcting defects, etc. The contracting officer did what he could to get stage 1 in shape for the move. He did not feel at the time that the work in stage 1 was sufficiently completed to warrant him in giving notice to the Postmaster General that the move could be made until July 14, knowing that it would be several days before formal authority to move would reach the Grand Central Annex postmaster. Such notice was received by the postmaster of the Grand Central Annex Station on July 25, 1939, and the move was commenced the next day and completed on August 14. We have considered that under the most favorable circumstances there was a delay of not more than 31 days (see finding 20 (4)) which, we think, should be attributed to the circumstances under which plaintiff's work had to be performed and to the normal activities and business of the post office carried on, rather than to the fault of either party. Therefore, plaintiff is not entitled to recover on this item of the claim.

*Setting toilet fixtures out of regular order.*—The facts relating to this claim for $315.29 are set forth in finding 60. Plaintiff claims that because toilet room No. 1 was in stage 2 and the post office had moved into completed stage 1, its plumbing subcontractor should not have been required to temporarily set and connect these water and toilet facilities for use of the post office employees until all other work, such as plastering and setting tile, had been completed and the terrazzo floor finished,

The post office officials and the construction engineer found that this work was necessary at the time required, in October 1939, to provide adequate toilet facilities for the regular postal employees and those that would have to be added to handle the increased business during the Christmas period. Without the installation of these facilities, no temporary facilities were available, as provided in the contract. The work was performed in order to provide temporary facilities in lieu of permanent facilities, and we think it was properly requested as a contractual requirement.

*Removal of a 4-inch water main and meter.*—The essential facts with reference to this claim for $733 are set forth in finding 65. This claim is similar to the claim covered by finding 64, and discussed hereinbefore, involving the removal of pipe lines under the ground floor, and the specifications and drawings there discussed are applicable here. Plaintiff says this work was not one of the job conditions and was not required by the specifications and drawings. We cannot agree. The work required by the contract could not have been satisfactorily completed without the removal of this pipe and meter since they would have been left exposed four inches above the elevation of the new first floor. We think that completion of the work in accordance with the contract required performance of this work. We are of the opinion that such work was within the fair and reasonable scope of the plans and specifications, as held by the contracting officer.

 *Pneumatic tube equipment.*—This claim of plaintiff for $40,440 involves the question of whether that part of the pneumatic tube equipment which was within the building to be remodeled was "mechanical equipment" which was required to be removed by plaintiff and retained by it as its property. Plaintiff appealed on this item of its claim. The claim is one of those listed above and in finding 23, and the essential facts relative thereto are set forth in findings 45 to 54, inclusive. Plaintiff says that the refusal of the construction engineer and the contracting officer to allow it to remove and keep this equipment, which consisted principally of motors, compressors, blowers, tanks, controls and switches, 950 feet of special piping (machined inside) and various special fittings, valves, etc., was a breach of the contract.

This equipment was not owned by the defendant, but was owned and had been installed and was operated to June 1938 by the New York Mail and Newspaper Transportation Company and the Government paid that company a stipulated rental for the use and operation of the equipment and system which served to handle and transport mail matter to and from the Grand Central Annex Station and 23 other postal stations in New York City. It extended over a total distance of 28 miles underground. After June 1938, the system was operated by the postal employees. The annual rental was fixed on a mileage basis. The system had been in use for 30 years.

This pneumatic tube assembly inside the building was specially designed and assembled for the purpose for which it was used. Some of the pieces of equipment bore plates on which were inscribed the inventory number of the owner, the New York Mail and Newspaper Transportation Company, and the legend "Installed under the patents of the American Pneumatic Service Company."

Machines comprising the power plant were on floating platforms resting on supports separate from the foundations and floors of the building. Plaintiff's contract required it to construct similar floating platforms for these machines in a different location. Plaintiff was also required to make provision for outlets in the new work for pneumatic tube piping, and to build tube form cases. All these requirements were necessary incidents to the relocation of the pneumatic tube equipment which was disclosed by the contract.

Defendant had notified the owner of the equipment in 1936 of the contemplated remodeling, and asked for plans for the relocation of the equipment, drafts of which the owner prepared and supplied in 1936 and 1937.

There was no provision in plaintiff's contract (or in the specifications or drawings) requiring plaintiff to move, to remove or to relocate the pneumatic tube equipment.

This work of moving and relocating was done by a contractor other than plaintiff under a contract with defendant dated May 29, 1939, for which bids had been invited on September 8, 1938. Equipment formerly in use was moved to the new locations specified on Drawings 2, 3, and 4, except for one blower, a tank, and a switchboard, for which replacements were furnished by the owner, the replaced items being sent to storage by the owner.

Drawing 3, showing plans for the remodeling of the first floor, contained the following note:

"Entire interior finish on this floor shall be removed including * * * all mechanical equipment * * * unless otherwise noted."

See Drawing No. 13 for existing work.

In the center of Drawing 3, between lines 31 and 32, at line XX, the pneumatic tubes were depicted and indicated by a legend: "Pneumatic tubes not in this contract."

Similar statements appeared on Drawings 2 and 4 relating, respectively, to the ground floor plan and second floor plan. The contract drawings showed that the pneumatic tube equipment and system was to be relocated within the building and required plaintiff to make building changes to accommodate such relocation. There were no statements appearing anywhere in the specifications or on the drawings that any of the pneumatic tube equipment was to be removed and, we think, it is clear that plaintiff had no reasonable cause to assume that any of this equipment was to be removed by it and retained as its property. The reference to "Conveyors" in the specifications, which were wholly inside the building and which were to be removed, was obviously not intended to include the tube system equipment. These were belt conveyors which were separate and distinct devices. If plaintiff had had any idea when it was preparing and submitting its bid that the equipment constituting essential and necessary parts of the pneumatic tube system was "mechanical equipment" to be removed and retained by it, the statements and information contained in the specifications and shown on the drawings, as well as

an examination of the site from which plaintiff could see how the system operated and the purpose served by it, were sufficient to put plaintiff on notice that it should make inquiry as to whether such equipment was included within the term "mechanical equipment" to be removed. In our opinion the specifications and drawings are not susceptible of the interpretation contended for by plaintiff. The drawings did not show, as plaintiff contends, that "All mechanical equipment" was to be removed by it. The notes with reference to removal of "mechanical equipment" contained the important qualifying clause—"Unless otherwise noted," and the notes "pneumatic tubes not in this contract," and other information disclosed on the drawings relative to relocation were, we think, clearly sufficient to put plaintiff on notice that it was not to have any of the pneumatic tube equipment.

Plaintiff says that in making its original bid it made an allowance for all mechanical equipment, including that constituting a part of the pneumatic tube system, and that the day before bids were opened its telegraphic reduction of its total bid by $41,000 represented to the extent of $40,440 a further allowance for the salvage value of the pneumatic tube equipment. (See finding 52.) The telegram did not so state. It stated only a lump sum reduction. Plaintiff's evidence that it was intended as a credit on account of this equipment is not convincing. But even if it was so intended plaintiff was not justified in the view that it would be entitled to such equipment, and since it did not expressly tell the defendant's contracting officer that this reduction represented, in whole or in part, a credit for the salvage value of this particular equipment, it has no valid claim for recovery from defendant. Cf. Olson Construction Co., et al. v. United States, 75 F. Supp. 1014, 110 Ct.Cl. 249.

*Acoustical material.*—The facts with reference to this claim for $2,093.72 for furnishing and installing acoustical material in certain elevator machine rooms are set forth in findings 42–44. The specifications contained a provision in section 37A requiring that the walls and ceilings (except beams) of elevator machine rooms be cov-

ered with a noninflammable, sound-absorbent material, known throughout the record as "acoustical material." There were several such machine rooms. Another specification provision set forth that in case of difference between the specifications and drawings the former would govern. Another contract document designated as "drawing 215," and entitled "Schedules," contained tabular columns with reference to surface finishes, one of which was headed "Interior Finishes." Under this column the ceilings in two elevator machine rooms, one on the second floor mezzanine and one on the fourth floor, were listed as "unfinished." Plaintiff says, first, that Drawing 215 was, in reality, a specification and not a drawing within the meaning of the conflict provision mentioned above. We cannot agree. It was a document customarily included among the drawings and was designated on its face as one of the drawings. We think the provision as to conflicts is applicable to this document. Plaintiff next contends that there is no conflict since paragraph 37A-1 designated only the finish to be applied and Drawing 215 designated where it was to be applied. We cannot agree with this interpretation. The language of paragraph 37A-1 (finding 71 (6)) is not limited to the finish, it is entitled "Elevator machine rooms" and says that "The walls and ceilings (except beams) of elevator machine rooms shall be covered," etc. On its face it included all elevator machine rooms, and we cannot read into it the qualifying exception for which plaintiff contends. In our opinion the specification called for this material and work, and plaintiff is not entitled to recover.

*Installation of concrete arch in vault light area.*—The pertinent facts concerning this claim for $1,734.17 are contained in findings 29-35. On the facts we are of the opinion that the contracting officer correctly decided that in order for plaintiff to comply with the requirements of the contract specifications and drawings relating to the new floors it was necessary for it to remove the old vault lights (glass set in concrete) and to install a new concrete floor fill or arch of the required thickness. Otherwise it would have been necessary to modify the specifications and drawings by a change order. The proof shows that plaintiff could not comply with them if it allowed the existing vault light construction to remain. In our opinion the contracting officer's decision concerning this work was reasonable and should be sustained.

*Temporary heating facilities.*—In this claim plaintiff seeks to recover $5,643.17. The facts and the contract provisions relating thereto are set forth in findings 24–28 and findings 69 (2) and (4), and 71. Plaintiff appealed on this item.

Before and at the time the specifications were written and at the time the contract was entered into March 10, 1938, the Grand Central Annex Post Office building was heated by hot air supplied from the pipe gallery floor and forced through ventilating ducts. Before the contract was awarded one workroom in the post office on a lower floor was heated by radiators with steam from a source brought into the building by the New York Central Railroad Company. The steam supply pipes to these radiators were disconnected before the contract was awarded.

Section 3, paragraphs 47–50, and section 45, paragraphs 49 and 50, of the specifications provided as follows:

"3-47. Temporary Heating.—The contractor shall maintain temporary heat for the buildings as may be necessary to protect all work and materials against injury from dampness and cold and as follows:

"At all times, during the placing, setting and curing of concrete a temperature of not less than 50 degrees Fahrenheit.

"When beginning the application of plaster and during its setting and curing period a temperature of at least 50 degrees Fahrenheit.

"For ten days previous to the placing of the interior wood finish and throughout the placing of this and other interior finishing, varnishing, painting, etc., and until the completion of the building a temperature of not less than 70 degrees Fahrenheit shall be maintained in the building.

"The contractor will be permitted to use steam from the system now supplying the building under the direction of the con-

struction engineer and in his discretion, without additional cost to himself, the contractor shall furnish, install, and maintain adequate steam piping and radiation necessary to provide the specified temperature.

"3–48. While the building is being remodeled, the contractor shall provide all partitions and other means, temporary radiation, etc., in the occupied portions of the building in order that a temperature of not less than 70 degrees F. may be maintained during the heating season. The construction engineer and custodian shall be the judges as to the sufficiency of this heating, etc.

"3–49. The Government will continue to employ the fireman, etc., now in the service, but if any additional labor is necessary for the maintenance of the specified temperatures, the contractor is to arrange for competent men with the custodian and the construction engineer.

"3–50. All required radiators must be connected up temporarily to maintain the specified temperatures. The custodian and the construction engineer will determine when heating shall be provided in the occupied building."

"*Section 45. Mechanical Equipment—Activity of Installation*

"45–49. The first construction stage as relates to heating and ventilating work shall generally consist of the following:

"(A) Erection of fans (No. S2 and No. E2 used temporarily) for maintenance of ventilation to the present Post Office quarters, including all sheet metal work. All as shown on Drawing No. PHV–464.

"(B) Demolition of present equipment and removal of same from premises.

"(C) Installation complete of all work (with the exception of certain portions where the leaving of present ducts in service may interfere) on the second floor, mezzanine floor, third floor, pipe gallery, fourth floor, fifth floor, and roof. Also installation complete of all work in the portion of the ground floor and first floor not occupied by the post office.

"(D) Installation complete of all piping, etc., below ground floor. * * *

"45–50. All of the above work shall be included as a part of this Contractor's

base price and including 16 hours daily attendance and maintenance of ventilating service for the Post Office present quarters."

The specifications dated January 19, 1938, originally contained paragraphs 45–51 and 52, as follows:

"45–51. Should the first construction stage take place during the heating season, this contractor shall name an alternate price for the temporary installation of all heating work shown on Drawing No. PHV–464 using permanent equipment temporarily and supplementing same with auxiliary additional equipment as required. He shall also include in this figure temporary heating service for 24 hours daily including all required maintenance and attendance, supplies, etc. However, the post office will pay for all steam purchased for this purpose.

"45–52. At the conclusion of the first construction stage, all temporary work shall be dismantled and the equipment reset and reconnected permanently as shown and described. At this time, the parts of the building completed shall have all heating work complete and in operation, and heat shall be maintained 24 hours daily, as required, during any portion of the heating season in all parts of the building used by the post office."

The above paragraphs 51 and 52 were eliminated by addendum 4, issued February 18, 1938. Also on February 24, 1938, addendum 7 was issued which stated in part that "All costs for operation and maintenance of present and temporary ventilating systems will be borne by the Government."

Plaintiff received these addenda before submitting its bid on March 4, 1938.

On February 18, 1938, plaintiff wrote from New York to the Director of Procurement at Washington inquiring "whether it is the intention of your department to *maintain* the *ventilating* system now in place during the time that all new work is being installed," and stating further that "We would like to know whether this * * * will be maintained by the Custodian * * * or whether the successful contractor will be required to pay all

costs in conjunction with said maintenance." [Italics supplied.]

Plaintiff relies upon this letter and addenda 4 and 7, and insists that the Government agreed or was required by the specifications, as amended, to furnish all necessary temporary heating facilities. The Government furnished the heat as provided for in paragraphs 3–47 and 49, supra.

Plaintiff demolished the existing ventilating system and no temporary ventilating system was installed. Addendum 7 cannot be construed as an undertaking by the Government to furnish and install a temporary ventilating heating system, and addendum 4 cannot be construed as obligating the Government to furnish and install other temporary heating facilities called for and required of plaintiff by the remaining provisions of the specifications hereinabove quoted.

Acceptance of plaintiff's interpretation of addendum 4 (corrected by addendum 8) and addendum 7 would have the effect of eliminating not only paragraphs 45–51 and 52, but ·by inference other provisions of the specifications contained in sections ·3–21, 3–47, and 3–50. Had such been the purpose or intention we think the addenda would have stated simply that the Government would furnish temporary heating facilities and heat or steam therefor. If, as plaintiff says, it made its bid on the assumption that defendant would furnish all necessary temporary heating facilities, its assumption was not a reasonable one in view of the various contract provisions not mentioned in addenda 4 and 7.

■ *Excess deduction for metal louvers.*—The facts with reference to this claim for $750 are set forth in findings 36–41.

Under the contract, metal louvers were to be installed on fifty or more windows. Defendant found that double heavy sash could not be operated if the louvers were installed. It ordered the elimination of the louvers not already installed aggregating 1,344 square feet on 26 windows and asked plaintiff to submit a proposal for a deduction for the omission of this work under its contract. After some correspondence, plaintiff submitted a final proposal for a deduction of $471 for the omission of louvers on twenty windows, totaling approximately 850 square feet of space, at a price of about sixty cents per square foot. Following an exchange of correspondence relative to the omission of louvers on the remaining six windows and the price per square foot applicable to all louvers omitted, the Commissioner of Public Buildings on May 13, 1941, ordered a deduction of $1,400 from the contract as a fair and equitable adjustment for the omission of louvers on the 26 windows.

The evidence shows and we have found that the contracting officer's decision was reasonable and that the amount deducted for the material and work eliminated was fair and equitable. Other than giving notice that it did not agree with the contracting officer's decision, plaintiff took no further action. See United States v. Callahan Walker Construction Co., 317 U.S. 56, 63 S. Ct. 113, 87 L.Ed. 49.

The defendant makes a number of contentions with reference to the right of plaintiff to maintain this suit independently of the merits of the various items of the claim. But in view of our conclusions that plaintiff is not entitled under the facts to recover on any of its claims on the merits, it is not necessary to ·discuss the other questions argued by the defendant. These contentions are, in substance, that plaintiff did not, in any instance, take an appeal from the decision of the contracting officer; that the Commissioner of Public Buildings succeeded the Director of Procurement as contracting officer and the Administrator of the Federal Works Agency succeeded the Secretary of the Treasury as the head of the department; that plaintiff did not in many instances protest that defendant was delaying the work; that in numerous instances plaintiff did not demand or obtain a written order for alleged extra work; that independently of Article 15, section 3–20 of the specifications made the decisions of the contracting officer involving interpretations of the specifications and drawings final on all questions; that under section 39 of the specifications the defendant was relieved of all liability for delay caused by it, even if found to be unreasonable, and that under the provisions of the electrical and plumbing subcontracts plaintiff cannot maintain suit on behalf of these subcon-

tractors under the cases of Severin v. United States, 99 Ct.Cl. 435, and James Stewart & Co. v. United States, 63 F. Supp. 653, 105 Ct.Cl. 284.

Plaintiff is not entitled to recover on any of the items of its claim and the petition is dismissed. It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN, and WHITAKER, Judges, concur.