**FLEXIBLE METAL HOSE MANUFAC-
TURING COMPANY**

v.

**The UNITED STATES.**

No. 61–82C.

United States Claims Court.

Feb. 13, 1984.

Dock A. Blanchard, Ocala, Fla., for plaintiff. Richard D. Custureri, Ocala, Fla., of counsel.

Stephanie Wickouski, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

YOCK, Judge.

This Government contract case involves review, under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1976), of a decision by the National Aeronautics and Space Administration (NASA) Board of Contract Appeals (Board). NASA BCA No. 378–2, 79–1 BCA (CCH) ¶ 13,765 (1979).

The case involves the installation of a cryogenic piping system used in the Space Shuttle's main propulsion system. The dispute arose from the need by the plaintiff to place insulation on the piping in order to meet NASA heat leak specifications. The plaintiff sought additional compensation for

the cost and installation of the insulation in the piping system claiming that NASA failed to disclose or share superior knowledge that the insulation was required in order to meet the heat leak specifications. Plaintiff also claimed that NASA ordered a change to the contract by specifying the brand of insulation that the contractor had to use in the system.

Both parties have moved for summary judgment. Upon consideration of the briefs of the parties, and after careful consideration of the entire administrative record in this matter, it is concluded that defendant's motion for summary judgment should be granted and the plaintiff's motion denied.

### Facts

The facts stated herein were found by the Board, or are otherwise properly derived from the administrative record. *See Ordinance Research, Inc. v. United States,* 221 Ct.Cl. 641, 609 F.2d 462 (1979).

In January 1977, NASA issued an invitation for bids (IFB) for the manufacture of cryogenic piping and flexible hose systems for use in the tail service mast of the Space Shuttle's main propulsion system. The invitation for bids included the following relevant specifications:

The piping assemblies, excluding end fittings, shall have a maximum heat leak of 12 BTU/HR/FT when external ambient temperature is 70 F and internal temperature is minus 320 F for the LOX system and minus 423 F for the LH2 system. Radiant shield insulation and suitable getter material may be used in the annular space if necessary to satisfy the maximum heat gain and surface temperature requirements of this specification. Insulation shall not be thermal cycle sensitive. A hydrogen getter such as palladium oxide may be used to assist in maintaining the required vacuum levels.

All materials in contact with the working medium shall be compatible with gaseous, or liquid oxygen, gaseous or liquid hydrogen, gaseous or liquid nitrogen, or gaseous helium and shall meet the compatibility requirements of NHB 8060.1.

In addition, the IFB included drawings and charts that did not show insulation to be designed into the piping system.

Only one firm responded to the IFB, that firm being the plaintiff in this action, Flexible Metal Hose. However, the bid as submitted by the plaintiff was late and consequently was rejected. NASA thereafter polled several potential contractors, including the plaintiff, to see whether they would be interested in negotiating the contract. Again, all potential contractors declined except for the plaintiff. Thereafter, on or about March 17, 1977, NASA issued its request for proposal (RFP) to the plaintiff, based on the same contract specifications and drawings included in the original IFB.

Prior to issuance of the RFP to the plaintiff, NASA's contracting officer, Mr. Barton Scott, had discussed with Mr. Tom Henderson, plaintiff's vice president for marketing, how much time would be needed for the plaintiff to prepare and respond to the RFP. Mr. Henderson advised Mr. Scott that a week to two weeks would be all the time that was necessary since the specifications and designs were to remain the same and plaintiff had already done the costing and design work to submit the initial bid. The plaintiff in fact delivered its response proposal to Mr. Scott within that time frame.

Thereafter, on April 5, 1977, Mr. Scott opened negotiation with Mr. Henderson on the plaintiff's proposal. The parties reached an agreement on or about April 7, 1977, for a total fixed price of $202,720.36, which was the same price as initially submitted by the plaintiff on its late bid. The price did not include any profit for the contractor. Mr. Henderson advised Mr. Scott that the plaintiff was not seeking any profit because the company wanted to get back into doing business with NASA by giving a competitive price. The plaintiff had done business with NASA some 10 to 15 years earlier on the Apollo project, wherein it had supplied similar cryogenic piping equipment. Thereafter, on April 11, 1977, the contract was formally awarded to the plaintiff. The contract required the

piping systems to be delivered to NASA on or about December 1, 1977.

One week after award of the contract, the plaintiff's project engineer, Mr. Edward Moore, began reviewing the details of the contract to commence ordering the necessary materials and supplies, and to develop an orderly plan for the fabrication of the piping systems. It was at this time that he focused again on the question of whether insulation was necessary in order to meet the heat leak specifications. Mr. Moore testified before the Board that he was puzzled as to why the specifications would make the insulation optional, and his puzzlement caused him to reconsider the necessity for insulation at this point.

Mr. Moore, who had some 24 years of experience as an engineer working for various companies doing business with the Government in the space program, had participated in the development of the plaintiff's original bid package submitted in this matter. He indicated that neither the original bid package nor the proposal forming the basis for the negotiations between Mr. Henderson and Mr. Scott had included any material or fabrication costs for insulation. This was done because the specifications made insulation an optional item only and the drawings did not include the insulation, although they went into great detail on other design matters. Mr. Moore determined from the specifications and from the drawings that NASA really wanted no insulation placed in the piping systems and that the heat leak requirement could be met without it. He felt that had the Government known that insulation was necessary to meet the heat leak requirement, they would have mandated the use of it. He did not, however, nor did anyone else at Flexible Metal Hose, check this optional insulation point with NASA prior to plaintiff's submitting the bid or negotiating the contract. Neither did he compute the heat leak requirement, although he said he could have if given sufficient time to do so. In any event, the plaintiff did not compute the heat leak requirement, seek technical outside advice, nor inquire of the Government on the point prior to the award of the contract.

As mentioned earlier, one week after award, Mr. Moore reconsidered the need for insulation and decided to seek some technical advice prior to commencing the fabrication process. He first turned to outside experts in the field, who advised him that meeting the heat leak specification without insulation would be "pretty tough." The consensus of the outside experts was that insulation should be used in this type of circumstance.

Shortly after receiving this advice (around the end of April 1977), Mr. Moore contacted Mr. Scott at NASA who took note of the technical questions involved and referred him to Mr. John Durham and Mr. Richard Murray, both design engineers employed at Planning Research Corporation (PRC). PRC was NASA's subcontractor for design and technical matters on the Space Shuttle program, and was responsible for the development of the insulation specification and drawings at issue in this matter. Mr. Moore presented a series of technical questions on various subjects to the PRC engineers, one of which related to the need for insulation. Both gentlemen indicated that in their experience, insulation was found to be necessary to meet the heat leak specifications on the liquid oxygen line (LOX) and the liquid hydrogen line (LH2), and that PRC had always used insulation on fuel lines such as this. When Mr. Moore requested their advice on the kind and source of insulation used, Mr. Durham indicated that in the past, PRC had used Dexter Microglas and aluminum foil in alternating layers on the LOX lines and aluminized Mylar on the LH2 lines. At the Board hearing, Mr. Durham testified that the Mylar was found to be incompatible (flammable) with the LOX lines but that aluminum foil in conjunction with the microglas had been found to work well. Mr. Durham indicated that at no time did they order Mr. Moore to use any particular insulation, but simply advised him as to what insulation had been used successfully in the past on the fuel lines. Mr. Durham testified at the Board hearing that he was somewhat sur-

prised at the insulation questions in general because he thought the points rather basic to those knowledgeable in the business.

After receiving this information, the plaintiff proceeded to fabricate the piping systems using only Dexter Microglas insulation on the LOX lines. Plaintiff also used aluminized Mylar on the LH2 lines. However, due to difficulties encountered in the application of the microglas on the LOX lines, the plaintiff again contacted NASA to request possible alternatives to the use of microglas. On or about July 8, 1977, Mr. Moore spoke directly with Mr. James Sullivan, NASA's technical representative on the contract. Among other things asked and discussed was whether aluminized Mylar was acceptable as insulation for the LOX line as well as the LH2 line. In addition, Mr. Moore asked whether Dexter Microglas was acceptable insulation on the LOX line and whether there was an alternate to that. After checking with his technical staff on these and other questions, Mr. Sullivan responded on or about July 11, 1977 that aluminized Mylar was not acceptable as insulation on the LOX line but that Dexter Microglas was and that they did not know of any brand name alternate to use for the Dexter Microglas. In so answering Mr. Moore's insulation questions, Mr. Sullivan testified at the Board hearing that he did not intend to limit the plaintiff to using Dexter Microglas on the LOX line. He only intended to convey to Mr. Moore that NASA did not know of any alternative from past experience that would work. He explained further that the heat leak specification was a performance specification and that as long as the heat leak requirement was met, the contractor could use any insulation material he chose or none—whatever the current state of the art would allow for the contractor to meet the heat leak specification. NASA did not mandate the use of insulation in the specification at issue because it did not wish to preclude any new state of the art innovations that might obviate the necessity for insulation.

The plaintiff thereafter completed its obligations under the contract, using Dexter Microglas as the insulation material for the LOX lines. On December 6, 1977, the plaintiff submitted its claim in the amount of $17,488.52 to the contracting officer for the additional costs claimed due as a result of the use of the Dexter Microglas insulation. On January 13, 1978, the contracting officer issued his decision denying the plaintiff's request for additional compensation on the ground that the use of any insulation material did not constitute a change to the contract. Thereafter, the plaintiff timely appealed the contracting officer's decision to the NASA Board of Contract Appeals.

On March 20, 1979, the appeal was denied by the Board. The Board in summary stated that:

1. Because * * * [Flexible Metal Hose] * * * was not directed to use a specific insulation, there was no change to the contract resulting from the use of that insulation.

2. The information about the advisability of using insulation was reasonably available from sources other than * * * [NASA] * * *. Therefore, * * * [NASA] did not violate a duty to disclose that information.

The plaintiff's Motion for Reconsideration of the Board's decision was denied on July 12, 1979.

Thereafter, the plaintiff filed its petition for relief in the United States Court of Claims on February 3, 1982.

*Discussion*

Before this Court, the plaintiff contends that the decision of the Board is not supported by substantial evidence in the record and is incorrect as a matter of law. Specifically, the plaintiff stresses two major points where the Board erred. First, it argues that the Board erred in its factual findings and its legal conclusions when it determined that NASA did not violate a duty owed to its contractor to disclose superior knowledge that the insulation was necessary in order to meet the heat leak specifications. Second, plaintiff contends that the Board erred when it found that NASA had not specifically ordered plaintiff to use

a particular brand of insulation when a less costly type would have sufficed.

Defendant counters in defense that the findings and decision of the Board are correct as a matter of fact and law and are entitled to finality under the standards of the Wunderlich Act.

Under the standards of the Wunderlich Act, the factual findings of the Board are considered final and conclusive unless shown to be arbitrary, capricious, so grossly erroneous as to imply bad faith, or not supported by substantial evidence. *Northwestern Industrial Piping, Inc. v. United States*, 199 Ct.Cl. 540, 545, 467 F.2d 1308, 1310 (1972). Absent such a deficiency, the Court is bound by the Board's factual findings even though the administrative record might support different or contrary findings as well. *Wickham Contracting Co. v. United States*, 212 Ct.Cl. 318, 322–23, 546 F.2d 395, 397 (1976). Plaintiff has to meet a heavy burden in order to establish that, on the record before the Board, the Board's findings are not supported by substantial evidence. *See Koppers Co. v. United States*, 186 Ct.Cl. 142, 147–51, 405 F.2d 554, 556–59 (1968).

Questions of law resolved by the administrative tribunal are neither final nor binding on the Court. *Aluminum Company of America v. United States*, 2 Cl.Ct. 771, 776 (1983); *Chemithon Corp. v. United States*, 1 Cl.Ct. 747, 750 (1983); *Arundel Corp. v. United States*, 207 Ct.Cl. 84, 97, 515 F.2d 1116, 1123 (1975). Legal interpretations by such boards, however, are considered helpful even if not compelling, and such interpretations will be given great weight, especially if reasonable and based on the particular board's expertise. *See Dale Ingram, Inc. v. United States*, 201 Ct.Cl. 56, 71, 475 F.2d 1177, 1185 (1973).

### A. Duty to Disclose

Plaintiff's first contention is that NASA violated its duty to disclose superior information to the plaintiff. Plaintiff asserts that the specification at issue made the use of insulation to meet the heat leak require-

ment optional when NASA knew that insulation was in fact necessary, thus misleading plaintiff to its detriment.

In support of its argument, the plaintiff cited the Board to the case of *Helene Curtis Industries, Inc. v. United States,* 160 Ct.Cl. 437, 312 F.2d 774 (1963). In that case, the Court of Claims found the Government to have violated its independent duty to reveal information to its contractor (bidders) when the product contracted for was new, required special knowledge to be able to manufacture it, and such knowledge was only reasonably available from the Government. The Court concluded:

> In this situation the Government, possessing vital information which it was aware the bidders needed but would not have, could not properly let them flounder on their own. Although it is not a fiduciary toward its contractors, the Government— where the balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word.

*Helene Curtis Industries, Inc. v. United States, supra,* 160 Ct.Cl. at 444, 312 F.2d at 778.

The Board, however, found this argument unpersuasive and the *Helene Curtis* case inapposite for several reasons. First, it concluded that the specification itself was not misleading because the specification stated that insulation "may be used * * * if necessary" to meet the heat leak specifications. Such a specification merely put the bidder on notice that alternate methods of performance were acceptable so long as the heat leak requirements were met. Second, the Board concluded that the information regarding the use of insulation on cryogenic fuel lines was readily available from sources other than NASA. NASA had been purchasing cyrogenic fuel lines from private parties for use in its space program for some 15 to 20 years and the technical knowledge had been in the market place for this period of time. Thus, the Board concluded that whereas the *Helene Curtis* rule was not controlling in this case, the corol-

lary to that rule was applicable, citing *H.N. Bailey & Associates v. United States,* 196 Ct.Cl. 166, 449 F.2d 376 (1971). The *Bailey* case held that if information is obtainable from other sources besides the Government, the Government can reasonably expect a contractor to seek that information himself and the Government is under no duty to volunteer information from its files. Third and finally, the Board concluded that the contractor had a duty to inquire about the insulation question prior to the award rather than one week after award. Facing tight time schedules for bidding (or negotiation) would not abrogate the contractor's responsibility to inquire about matters that may appear misleading, confusing or obviously ambiguous prior to award.

This reviewing Court finds the Board's conclusions correct on this issue both legally and factually.

■ To begin with, this Court agrees with the Board that the specification itself was not misleading. The specification was a performance specification that required the contractor to meet a certain heat leak or heat gain requirement. That was the essence of the specification. In meeting this requirement, the specification went on to state that "insulation * * * material *may be used * * * if necessary* to satisfy the maximum heat gain and surface temperature requirements of this specification." (emphasis added). In short, NASA was relying on the technical expertise of the contractor to meet the specification. If the state of the art required no insulation, then no insulation would be required by the Government. However, if the opposite was true, and insulation was necessary to meet the heat leak specification, then the contractor was under a contractual duty to so provide it. NASA had been purchasing this technical expertise in the marketplace for some 15 to 20 years. In fact, this same contractor had produced similar equipment for NASA some 15 years before for NASA's Apollo project. Thus, there was no reason for NASA to assume that the plaintiff did not have in house the technical expertise necessary to perform this contract, or the

ability to gain the expertise from outside sources if necessary. A reasonable contractor, knowledgeable in this business and bidding on a contract of this type, would not be misled by the specification as written. The Board's conclusion in this regard was not in error.

■ Next, the Court agrees with the Board's conclusion that information regarding the use of insulation on cryogenic fuel lines was readily available from sources other than NASA. The Board relied on the *Bailey* line of cases which hold that the Government is under no duty to volunteer information in its files if the contractor can reasonably be expected to have or to get the necessary information from outside sources. Although the plaintiff argues strenuously that only the Government possessed this information, and thus the *Helene Curtis* case is the controlling law, the facts elicited at the hearing simply do not support this argument. The facts are clear that the technology had been in the marketplace for some 15 years and that the plaintiff in fact had already supplied similar equipment to NASA some 15 years ago. In addition, Mr. Moore himself testified that he went to outside sources for advice on whether insulation was required to meet the heat leak requirement. This rather conclusively shows that the information was out there in the competitive market place. This technical knowledge was not novel nor was it possessed only by the Government. In addition, Mr. Moore also testified that he could have computed the heat leak requirement himself if given sufficient time. Clearly the information was available from outside sources, and thus the *Helene Curtis* case does not apply to these facts. The Board committed no error in relying on the *Bailey* line of cases on these facts.

■ Finally, the Court agrees with the Board's conclusion that the contractor had a duty to inquire about the insulation question prior to the award rather than after award. Although the plaintiff argues that a tight time schedule precluded it from computing the insulation requirement prior to bid (and negotiation), the facts do not

indicate that the time schedule was that onerous, or even if onerous, would have precluded the plaintiff from asking the contracting officer the question prior to award. This contract was ultimately negotiated and any confusion or ambiguity on the point should have and could have been cleared up in those negotiating sessions prior to award. *See Johnson Controls, Inc. v. United States,* 229 Ct.Cl. 445, 459, 671 F.2d 1312, 1320 (1982). The Government did not pressure the plaintiff into receipt of the RFP before it was ready. It was the plaintiff, through Mr. Henderson, that indicated that the RFP could be ready in seven to fourteen days because they had already done the basic costing and design work when they submitted their earlier bid on the project. A reasonable contractor would have solved the insulation puzzle prior to award rather than a week after award. The Board did not err in this regard.

### B. Government Change Order

Plaintiff's second contention is that the Government ordered a change in the contract when it directed plaintiff to use a certain kind of insulation. Plaintiff argues that it was required to use only Dexter Microglas insulation on the liquid oxygen (LOX) lines even though cheaper kinds of insulation were available to meet the heat leak requirements.

The plaintiff, however, did not prevail with this argument before the Board either. The Board found that neither of the Government's representatives who conversed with Mr. Moore on the insulation question had specifically ordered the plaintiff to use Dexter Microglas to the exclusion of any other insulation that might have worked. The Board found as fact that Mr. Durham had advised Mr. Moore that, in his experience, insulation was necessary to meet the heat leak specifications and that alternating layers of Dexter Microglas and aluminum foil had been found to be satisfactory to meet the heat leak specifications as to the LOX line. Aluminized Mylar had been found to be satisfactory for use on the liquid hydrogen line (LH2). Mr. Durham

specifically testified at the Board hearing that he did not order Mr. Moore to use Dexter Microglas on the LOX lines but merely offered advice as to his past experience. The Board found his testimony creditable and persuasive on this point.

Likewise, the Board found that Mr. Sullivan had merely advised Mr. Moore that aluminized Mylar had been found unacceptable as insulation in the LOX line in the past because of flammability considerations, and that Dexter Microglas was acceptable. Mr. Sullivan, in a specific answer to Mr. Moore's question about whether Mr. Sullivan knew of other alternates to the Dexter Microglas, said that he did not know of any. The Board concluded from Mr. Sullivan's testimony and from the documentary evidence before it that Mr. Sullivan was advising Mr. Moore not that there were no other alternatives available, but only that he and NASA did not know of any alternatives from their experience.

The Board thus concluded that neither Mr. Durham nor Mr. Sullivan had ordered Mr. Moore to use Dexter Microglas to the exclusion of any other compatible insulation. In short, the Board found Mr. Moore's testimony to the contrary unpersuasive, the Government's evidence persuasive, and made the appropriate findings of fact.

■ This Court finds the Board's factual findings in this regard supported by substantial evidence in the record and thus entitled to finality. *Koppers Co. v. United States,* 186 Ct.Cl. 142, 151, 405 F.2d 554, 559 (1968).

The plaintiff in this regard cites this Court to the case of *Olson Construction Co. v. United States,* 110 Ct.Cl. 249, 75 F.Supp. 1014 (1948). That case held that when the Government specifically orders a contractor to use a more expensive product than called for by the specifications, there is a change and the contractor may recover an equitable adjustment therefor. The holding in that venerable case is still good law. However, its facts and legal conclusions are inapplicable to this case. In this case, the Board found the facts to support the Government's argument that no direct or-

der had been issued to the plaintiff to use Dexter Microglas. Had the plaintiff found a less costly alternate to use that would meet the heat leak specifications, it could have used it. Mr. Moore simply misinterpreted the advice and recommendations received as orders when in fact they were not. The specifications put the duty on the plaintiff to make the ultimate decision as to what materials to use to meet the heat leak requirements. The Board so found and the findings are supported by substantial evidence in the record. There is no error as a matter of law.

This is clearly a case where the obligation was on the plaintiff to determine what materials would be necessary in order to produce the cryogenic fuel lines to specification. The Government in this case did not breach any duty of disclosure to the plaintiff nor did it specifically order a change to this contract. The Board's factual findings are supported by substantial evidence in the record and there are no errors as a matter of law. The plaintiff has failed to show that the record before the Board does not support the Board's findings and conclusions. *See Sundstrand Turbo v. United States,* 182 Ct.Cl. 31, 60, 389 F.2d 406, 422–23 (1968). Under the circumstances, plaintiff is not entitled to recover.

## CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment is granted and the plaintiff's motion for summary judgment is denied. Plaintiff's complaint is to be dismissed.