Per Curiam:
This case was referred pursuant to Rule 54(b) to Trial Commissioner Richard Arens, with directions to make a recommendation for conclusion of law on defendant’s motion to dismiss petition or in the alternative for summary judgment. The commissioner has done so in an opinion filed on November 2, 1964. Plaintiff sought review of the commissioner’s opinion and recommendation for conclusion of law and the case was submitted to the court without argument of counsel. Since the court is in agreement with the opinion and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, not entitled to recover, defendant’s motion, as a motion for summary judgment, is granted and plaintiff’s petition is dismissed.
OPINION OF COMMISSIONER
Plaintiff was awarded a contract by the Bureau of Yards and Docks of the Department of the Navy to perform site-preparation work for a United States naval radio station in Maine.
Plaintiff made three claims arising- out of the contract, which were denied by the contracting officer. Thereafter, plaintiff took a separate appeal on each of the claims to the Armed Services Board of Contract Appeals which denied each appeal. In this court, plaintiff alleges that the decisions of the Board were arbitrary and capricious, not supported by substantial evidence and, in specified instances, were erroneous as a matter of law. The case is before the court on defendant’s motion for summary judgment.
Under the contract, which was awarded January 13,1958, plaintiff undertook to perform clearing and grubbing work on approximately 1,350 acres of land in Maine, and to furnish *473 all labor, equipment, and materials necessary to that end, for the lump-sum contract price of $317,000. In the plans, which were included in the contract documents, the land was subdivided into Area I and Area II. The contract provided that clearing and grubbing were to be performed throughout Area I and that clearing only was to be performed throughout Area II.

Claim 1

Plaintiff alleges that although under the contract no removal of boulders and stone walls from the site was required, nevertheless, the presence of surface and subsurface boulders on the site in any appreciable quantity would interfere with and make more costly the clearing and grubbing operations and that, accordingly, plaintiff, before bidding on the job, made a thorough site examination and carefully inspected all proposed contract documents in order fully to acquaint itself as to the conditions existing at the site; that in reliance upon the site examination and upon the proposed contract documents, plaintiff based its bid upon its estimate that there would be a maximum of 9,000 cubic yards of surface boulders on the site, but that it was actually required, in the course of its clearing and/or grubbing operations, to dislodge and move in excess of 46,000 cubic yards of surface and subsurface boulders.
Plaintiff further alleges that the existence of the excessive subsurface boulder content constituted a change of conditions within the meaning of the standard changed conditions clause of the contract, entitling it to additional compensation; that the existence of the approximate actual surface and subsurface boulder content on the site was contained in an “Advance Planning Report” of the Bureau of Yards and Docks, but that the Bureau did not make the report available to plaintiff nor tell it of the conditions actually existing at the site; that the failure of the Bureau to disclose to plaintiff the existence and contents of the report constituted a material misrepresentation, and, by reason thereof, plaintiff was induced to underestimate the boulder content on the site and to incur extra expense in its work.
*474 Plaintiff’s president appeared before the Navy Contract Appeals Panel, as its sole witness on plaintiff’s first claim, and testified in substance that the person who had made the site examination for plaintiff did not give plaintiff much specific information on the amount of boulders present because the area was overgrown with brush; that since certain portions of the area had been used as farmland, and since defendant’s agent had indicated that defendant was going to lay cables 18-inches deep in the area, plaintiff assumed that relatively few subsurface boulders would be encountered. He further testified that, before the contract was entered into, defendant had in its possession an advance planning report which showed substantial subsurface-boulder content on the site, but that this report was not made available to plaintiff.
Testimony adduced by defendant before the Panel was to the effect that visual examination of the area prior to the issuance of the invitation to bid revealed the presence of considerable surface boulders, and that this would indicate the presence of a substantial quantity of subsurface boulders; that only a relatively small acreage had been cleared for farm land; and, that no representation had been made to plaintiff by any agent of defendant respecting the quantity of subsurface boulders. The advance planning report, prepared for defendant by a firm of consulting engineers, in pertinent parts, reads:
Associated with most of the VLF Site is a perched water table which results in permanent surface water or an easily reached water table.
Cover consists of fair to poor stands of fir interspersed with small stands of spruce, hackmatack and alder growths.
There are limited areas of boulder and gravel wherein surface drainage conditions are improved.
Surface ledge and ledge outcrops occur over substantial portions of this area. There are substantial areas of heath (muskeg) found throughout this Site.
❖ * * ❖ *
The site preparation will require the following operations: (1) cutting and grubbing the entire area. * * * (3) removal of all boulders six inches or more in diameter to a depth of 18 inches, or covering of bouldery areas with at least one foot of soil
*475 In denying plaintiff’s appeal, the Board[1] quoted the relevant portion of the changed conditions clause which reads:
4. CHANGED CONDITIONS
* * * (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.* * *
The Board then stated that it did not find that plaintiff encountered a quantity of subsurface boulders of an unknown and imusual nature which differed materially from those ordinarily encountered on the Maine seacoast where the jobsite was located; that the outcropping of boulders which could be observed indicated a presence of subsurface boulders; that the inferences which plaintiff chose to make from the prior use of certain portions of the area as farmland and from the defendant’s intentions to lay certain cables in the area, was a matter of individual judgment; and, that plaintiff’s explanation that it did not anticipate encountering any subsurface boulders was unrealistic in the face of the known and visual physical conditions appearing at the site.
In its present posture, this claim presents a question of fact under the standard Government disputes clause and the administrative determination of such question is, under the Wunderlich Act (68 Stat. 81, 41 U.S.C. § 321), final unless the decision thereon is “fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.” United States v. Carlo Bianchi & Co., Inc., 373 U.S. 709 (1963); Lenry, Inc. and William P. Bergan, Inc. v. United States, 156 Ct. Cl. 46, 297 F. 2d 550 (1962); Henry E. Wile Company v. United. States, 144 Ct. Cl. 394, 169 F. Supp. 249 (1959).
From the record as a whole, it is clear that there was before the Board substantial evidence to support its conclusion. River Construction Corporation v. United States, 159 Ct. Cl. 254 (1962). Plaintiff complains that the Board decision *476 gave no weight to the failure of the Navy to advise plaintiff of the existence in the Navy’s files of the advance planning report, but the failure of the Board to mention the report in its opinion does not justify the conclusion that the Board did not consider the report which was in evidence. Plaintiff alleges that an error of law was committed by the Board in failing to rule that there was misrepresentation by defendant in not making the report available to plaintiff, but the language of the report does not reveal any information which could not have been readily ascertained in the site examination, and plaintiff has not shown how the report could have helped it to estimate the amount of subsurface boulders in the area. Alvin H. Leal, trading as Plains Construction Company, and Mercantile National Bank at Dallas, a corporation v. United States, 149 Ct. Cl. 451, 276 F. 2d 378 (1960).
Plaintiff’s first claim presents a factual situation similar to that in S.T.G. Construction Co., Inc. v. United States, 157 Ct. Cl. 409 (1962) in which the court noted that the contract, like the instant contract, made no representation as to the subsoil conditions that might be encountered, that defendant had not given plaintiff erroneous and misleading information or concealed the true character of the subsurface conditions, and that the subsoil conditions encountered could have been reasonably anticipated or foreseen from an adequate examination of the site. In that case, the court, finding nothing arbitrary or capricious in the administrative decision rejecting the claim and that the decision was based on substantial evidence, declared the decision to be binding on the court. Likewise, in the instant case, the proof regarding plaintiff’s first claim does not overcome the presumption of correctness of the administrative decision.

Claim 2

Plaintiff’s second claim arises from the fact that plaintiff encountered swamp (bog) area in excess of the 50 acres of such area as shown on the contract drawings which were derived from an aerial survey. The contracting officer, pursuant to the changed conditions clause of the contract, found that the additional swamp area comprised 166 acres and al *477 lowed plaintiff a unit price of $500 per acre for clearing and grubbing the additional acreage. Plaintiff alleges that the additional swamp area consisted of 205.6 acres, or 39.6 acres more than the additional acreage found by the contracting officer, and that the unit price for clearing and grubbing the additional acreage should be $1,119.10 per acre, or $619.10 per acre more than allowed by the contracting officer.
The contract did not detail the procedures for determining what constitutes “swamp,” but the parties agreed that swamp areas are “those areas where equipment used for clearing and grubbing cannot be operated or used in a normal maimer.”
Both plaintiff and defendant caused independent surveys to be made of the area concerning which the dispute arose. Plaintiff’s survey was made in the latter part of April 1958 and defendant’s survey was made in the latter part of May 1958, although dated in August 1958. The chief difference between the results of the two surveys involves a strip of ground of approximately 50 acres which plaintiff contends was swamp area, but which defendant contends was not swamp area.
On the issue of the additional swamp area, the Board’s opinion[2] reads in pertinent part:
6. Appellant’s survey was commenced in mid-April 1958 and the Government’s survey was made several weeks thereafter, whereas most of the clearing and grubbing work was not performed until a still later period. Further, under the contract Appellant was required to dig certain drainage ditches and, to the extent that these ditches as well as the natural run-off of the spring thaw ■ permitted the later clearing and grubbing operation to be performed in a normal manner, to that extent Appellant’s claim should be diminished. This improvement in the swamp area 'actually encountered was in effect conceded by Appellant in its explanation [sic] as to why it conducted its survey ahead of the Government’s. The record does not disclose the size of this reduction in swamp area, although it appears to be fairly substantial. *****
8. The question then remains as to whether this strip of nonswamp ground was actually present and in what *478 acreage figure. The record substantiates the Government’s survey and the Contracting Officer’s final determination. Not only was the presence of the strip of nonswamp area testified to by Government witnesses who were familiar with the site, but the evidence discloses that, even during the spring thaw season, Appellant was able in the main to bring in its heavy equipment across this strip without the same bogging down. This affords substantiation that Appellant’s equipment could be operated in this strip in a normal manner even early on the job, and certainly in the later period when the area had drained off considerably and when most of the actual clearing and grubbing work was in fact performed. Finally, Appellant has offered no substantiation of its claim that this nonswamp strip was less than the 39.6 acres in dispute herein.
9. In short, Appellant has failed to establish that the Government’s survey and the Contracting Officer’s determination based thereon were in error and, according, this element of Appellant’s claim must be denied.
An examination of the record before the Panel reveals that, although there were differences between the testimony adduced by plaintiff and by defendant, there was substantial evidence upon which the Board’s decision was based. See River Construction Corporation v. United States, supra; also see T. C. Bateson Construction Co. v. United States, 149 Ct. Cl. 514 (1960).[3]
We come then to the question of the unit price for clearing and grubbing the additional acreage. The correspondence between the parties, which ensued prior to the issuance of the change order reveals that although plaintiff did at one time quote a price of $600 per acre for clearing and grubbing the additional acreage, plaintiff subsequently agreed to accept the price of $500 per 'acre proposed by defendant, and that at the time of the issuance of the change order there was *479 no dispute between the parties except as to the acreage of the additional swamp area. Plaintiff signed the change order on the additional swamp area “under protest” and contended before the Panel that the unit price for clearing and grubbing the additional acreage, as well as the amount of the additional acreage, was properly open on appeal to the Panel. The Board [4] ruled that since at the time of the issuance of the change order the unit price for the additional acreage was not in dispute, plaintiff’s protest was only to the additional acreage and that plaintiff could not enlarge the area of dispute before the Panel to include the unit-price element.
The Board’s opinion further reads in pertinent part: 12. Moreover, the record establishes that the $500 per acre figure allowed by the Contracting Officer is fair and equitable. Appellant had bid $400 per acre for the 50 acres of swamp shown on the contract drawing; and, while Appellant at first asked $600 per acre for the additional swamp area, shortly thereafter and very early in the dispute and at all times until after signing off on Change “D” Appellant consistently accepted a $500 per acre figure for the additional swamp area. Finally, the $500 figure is consistent with other bids originally received for this work. Under these circumstances, we must conclude that the $500 figure represents a proper equitable adjustment of the per acre price for the additional swamp area encountered.
$ $ $ ‡ $
It is concluded from a reading of the testimony before the Panel that there was substantial evidence to support the Board’s factual decision that the parties had agreed on the unit price of $500 for clearing and grubbing the additional acreage and that this unit price represented a proper, equitable adjustment. United States v. Callahan Walker, 817 U.S. 56 (1942). Accordingly, on the authority of the cases previously herein cited, the administrative decision on plaintiff’s second claim must be deemed to be final and conclusive.

Olaim 3

Plaintiff’s third claim involves a dispute between the parties as to whether the job was completed by December 20, 1958, and, if not, what would be a proper charge against *480 plaintiff to represent the cost of completion. As heretofore indicated, in the plans which were included in the contract documents, the land was divided into Area I, which consisted of 1,000 acres, and Area II, which consisted of 350 acres and which is not in dispute.
As of the early part of November 1958, defendant had accepted plaintiff’s work on 657 acres of Area I. By letter dated December 22,1958, plaintiff advised defendant that the job was completely finished and that plaintiff had closed down completely as of 4:00 p.m., Saturday, December 20, 1958. Plaintiff performed no work thereafter. After various inspections of the jobsite were made, defendant claimed that certain work remained to be done and conferences were held by the parties concerning the allegedly incomplete work, but no agreement was reached.
By letter dated March 25,1959, defendant ordered plaintiff to omit the remaining work and advised that a Board of Changes had been appointed under Article 34 of the contract[5] to consider the effect of the order.
The two Government representatives on the Board of Changes submitted a majority report and plaintiff’s representative submitted a minority report. On May 9, 1960, the contracting officer, having apparently adopted the majority report, issued Change “E” to the contract whereby plaintiff was directed to omit the following services:
(a) Fifty percent of the grubbing and cleanup in 264 acres of high ground,
(b) Eighty-five percent of grubbing and cleanup in 79 acres of bog,
*481 (c) Waste and grading of 4,130 cubic yards of spoil material distributed along 7,000 feet of drainage ditcb.
Change “E” further provided for a decrease in the contract price of $21,190. Plaintiff did not agree to the change and, acting under the standard disputes clause, perfected its appeal.
Extensive testimony was adduced by both parties before the Navy Contract Appeals Panel respecting the conditions of the acreage in question and a number of photographs were introduced which allegedly showed the condition of the acreage after plaintiff had advised defendant that the job was completely finished. The evidence is abundantly clear that the work which plaintiff did accomplish on the acreage in question was not in accord with the specifications and, as the Board noted in its opinion, “the record contains many statements and admissions by Appellant [plaintiff] that items of contract wprk were left undone at 20 December 1058.” Testimony was received by the Panel from plaintiff’s witnesses to the effect that certain unnamed Government employees had indicated that plaintiff need not comply with the specifications and that the Government’s chief inspector, now deceased, had orally accepted plaintiff’s work. The Board, in its opinion, however, ruled that absent a clause granting him the power, a Government inspector does not have the authority to change specifications. The Board noted certain testimony which appeared to be in conflict with the acceptance by the deceased chief inspector of the work without compliance with the specifications.' The parties stipulated, moreover, “that acceptance is to be disregarded as an intention of completion; that the work speaks for itself; that whatever existed at the end was complete or it wasn’t complete.”[6]
Regarding the issue as to the amount of decrease in contract price, both plaintiff and defendant introduced before the Panel estimates as to the cost to complete the work. Plain *482 tiff introduced estimates varying from $1,500 to $9,000 as the cost of completion of the work to a standard less than the specifications. Defendant introduced an estimate of approximately $30,000 as the cost of completion of the work according to the specifications. The Board concluded that the $21,185.30 reduction in price arrived at by the majority of the Board of Changes was an equitable adjustment for the change under the contract. The basis for this adjustment in price was set forth in detail in the majority report of the Board of Changes in pertinent part as follows:
2. * * * The acreage of the unfinished work amounted to 343 acres as determined by planimetering the above mentioned drawings. Of this total area, 79 acres was determined to be swamp area and 264 acres was high ground area.
3. In considering the matter of price for the incompleted work, the Board considered that for the high ground area the price as set forth for the different elements of work in the original price schedule was satisfactory. This established a price of $200 per acre for the complete performance of the contract work of which $50 was for grubbing and $5 for cleanup. The Board, therefore, used the price of $55 per acre in arriving at a proper credit for the incompleted grubbing and cleanup on high ground. In establishing an appropriate price for work in the swamp areas, the Board reviewed the records available in the Besident Officer in Charge of Construction office and found that on two or three occasions representatives of the Government and the contractor had agreed on a price of $500 per acre as mutually satisfactory compensation for performing the contract work in swamp areas, this $500 to be in addition to the $200 per acre for which the Contractor was entitled if the acreage was high ground. Using the same ratio for grubbing and cleanup as was established for high land work, the Board determined that a reasonable price for cleanup and grubbing in swamp areas was $192 per acre.
4. The Board next considered the proportion of accomplishment of the work in the unfinished area. By walking the area, and by discussion with Government Inspectors, the Board’s judgment that grubbing and cleanup in the upland areas had been about 50% performed; and that the same work in the swamp areas had been about 15% performed; thus leaving 50% of the high land work undone and 85% of the swamp work undone. It was *483 further determined that approximately 7,000 lineal feet or 4,180 cubic yards, of spoil embankment resulting from ditch excavation had not been spread to allow lateral drainage into the ditches as required by the specifications. 5. Based upon the above findings and judgments, the credit for the incompleted work was computed as indicated below:
Highland 50% incomplete:
264 A. @ $ 55 x 50% =$ 7,260.00 Swamp 85% incomplete:
79 A. @ $192 x 85% =$12, 892. 80 Undistributed ditch excavation
4,130 c.y. @ 0.25 ■=$ 1,032.50
$21,185. 30
From a study of the majority report of the Board of Changes and of the testimony before the Panel, it is concluded that there was substantial evidence to support the administrative decision on both the extent to which the work was incomplete and the cost of completion.
In its response to defendant’s motion for summary judgment, plaintiff contends, without citation of authority, that the change order was in fact a termination of the contract and that the Board was wrong as a matter of law in giving any weight to the report of the Board of Changes regarding the extent to which the work was incomplete and the cost of completion. The Board found, however, that the parties adopted the procedures provided in the changes provisions of the contract as a practical method of resolving their dispute. This finding is likewise amply sustained by the record.
It is accordingly recommended that defendant’s motion for summary judgment be granted and that plaintiff’s petition be dismissed.

 ASBCA No. 5860, 60-2BCA paragraph 2832 (1960).

 ASBCA No. 6241, 60-2 paragraph 2843 (1960).

 In T. C. Bateson Construction Co. v. United. States, loc. cit. 518, the court stated:
The question before this court is a much narrower one. It is whether there was substantial evidence, i.e., such evidence as might convince a reasonable man, to support the conclusion reached by the agency officials. Whatever this court might have decided, if the case were before us as res nova, we have no doubt that there was, before the administrative officials, as there is before us, substantial evidence to support the conclusion which those officials reached. We must therefore hold their decision to be “final and conclusive.”

 ASBCA No. 6711, 61-2 paragraph 3231 (1961).

 34. CHANGES BOARD AND ESTIMATES
In determining any equitable adjustment under Clause 3, the Contracting Officer shall, in those instances -where the adjustment to be made in compensation is estimated by the Contracting Officer to amount to $10,000 or more, convene, and give full consideration to the report of, an advisory board of three members, consisting of two Government representatives appointed by the Contracting Officer and one representative appointed by the Contractor. This board shall estimate and report to the Contracting Officer the amount of the change in cost, time, or both, resulting from the ordered change. In making such estimate, the estimated cost of additions shall be based upon the estimated actual cost to the Contractor and the estimated cost of deductions shall be based upon the estimated cost to the Contractor as of the time the contract was made. To such cost estimates, 6 per cent shall be added by said Board to adjust the Contractor’s profits. In arriving at the amount of the change in price, if any, allowance may be made at the discretion of the Contracting Officer for overhead and general expenses, plant rental, and other similar items.

 Article 4 of the contract provided In part:
The failure of the Government in one or more Instances to insist upon strict performance of any of the terms of this contract * * * shall not be construed as a waiver or relinquishment to any extent of the right to assert or rely upon any such terms * * * on any future occasion.