**KOPPERS COMPANY, Inc.**

v.

**The UNITED STATES.**

No. 254–65.

United States Court of Claims.

Dec. 13, 1968.

John S. Nolan, Washington, D. C., attorney of record, for plaintiff; Philip S. Neal, Washington, D. C. and Paul H. Titus, Pittsburgh, Pa., of counsel.

Mary J. Turner, Washington D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

LARAMORE, Judge.

This is a suit to recover $48,280 as damages based either on a breach of contract or, alternatively, on the termination-for-convenience article of the contract.

Briefly, plaintiff's[1] claims stem from the Army's rejection of landing mats it had delivered as its best efforts to perform the contract. Subsequently, the contracting officer terminated the con-

---

1. Lamtex Industries, Inc., was the successful bidder on the contract in dispute and was the appellant in this matter when it was before the Armed Services Board of Contract Appeals. The plaintiff here, Koppers Company, Inc., acquired Lamtex in July 1963 and has succeeded to the latter's interest herein.

tract for default.[2] Plaintiff appealed to the Armed Services Board of Contract Appeals, pursuant to the Disputes Clause, and claimed that fulfillment of the design required by the contract specifications was impossible. Therefore, argued plaintiff, the termination was for the convenience of the government and not for its default because the causes of its failure to perform were beyond its control and were not the result of its fault or negligence. The Armed Services Board upheld the contracting officer and plaintiff appealed to this court.

Pursuant to our Order under Rule 54(b), Commissioner Lloyd Fletcher[3] filed his recommended opinion and conclusions of law on January 12, 1967. He found that the evidence overwhelmingly established that compliance with the specifications was impossible but he concluded that plaintiff had assumed the risk of impossibility. Therefore, it could not recover. After oral argument to the court, on November 17, 1967, we suspended these proceedings and returned the case to the ASBCA for more detailed findings of fact on the issue of whether performance was impossible and for

clarification of the Board's first decision wherein it had held that plaintiff did not prove that performance was a "legal impossibility."[4]

On February 21, 1968, the ASBCA issued a supplementary opinion in which it concluded, as it had in its first opinion, that "the evidence adduced by appellant falls far short of establishing that it was impossible or commercially impracticable for a qualified manufacturer to meet the contract requirements." The parties agreed that the Board used the proper legal standard of impossibility. Additional briefs have been submitted and the case has again been heard on oral argument. It is now before us for review of the commissioner's report and the Board's decision. That report, we note, was made solely on the basis of the evidence and testimony presented to the ASBCA.

## I.

Our initial task, in this as in all other cases which come before us for Wunderlich Act review, is to determine whether substantial evidence exists to support the Board's findings of fact.

---

2. The termination for default article of the contract is as follows:

"11. DEFAULT

"(a) The Government may, subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

"(i) If the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

\* \* \* \* \*

"(c) Except with respect to defaults of subcontractors, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. \* \* \*."

3. We are indebted to Commissioner Fletcher for his able assistance and we adopt, with some modifications, his recitation of the facts. We arrive at the same result as the commissioner but for a different reason.

4. The order reads, in part, as follows:

"\* \* \* [T]he court is unable to determine, from its placement in the opinion and its phraseology, whether the summary statement by the ASBCA that "we have not been persuaded by evidence for the appellant that the appellant's inability to perform in this case should be equated to *legal* impossibility" [emphasis added] is a true finding of fact under the proper standard, simply a legal conclusion, or a factual finding under an improper standard.

"IT IS THEREFORE ORDERED that proceedings here should be and are suspended to allow the parties to return to the ASBCA for further and more detailed findings on the factual issue of whether the fabrication of the landing mats by filament winding was impossible, as a matter of fact, under the legal standard set forth in Natus Corporation v. United States, 178 Ct.Cl. 1, 371 F.2d 450 (1967), and Johnson Electronics, Inc., 65–1 BCA ¶ 4628 (ASBCA No. 9366)."

The standards for this evaluation are not easily articulated. We have, however, postulated guidelines for, and limitations on, the scope of such review by defining the content of the substantial evidence rule (often by stating what it is not, rather than what it is).

Our starting point is the Wunderlich Act of 1954, 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1964 Ed.). It states that administrative determinations of disputes of fact are conclusive and binding on the court unless the finding of fact is fraudulent, capricious or arbitrary, or so grossly erroneous as to imply bad faith, or it is not supported by substantial evidence.

In United States v. Carlo Bianchi & Co., Inc., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), the Supreme Court considered the judicial review appropriate in cases governed by the Wunderlich Act and said:

> The term "substantial evidence" in particular has become a term of art to describe the basis on which an administrative record is to be judged by a reviewing court. *This standard goes to the reasonableness of what the agency did on the basis of the evidence before it,* * * *.
> [Emphasis added; 373 U.S. at 715, 83 S.Ct. at 1414] [5]

On remand (Carlo Bianchi & Co., Inc. v. United States, 167 Ct.Cl. 364 (1964),

cert. denied, 382 U.S. 841, 86 S.Ct. 32, 15 L.Ed.2d 82 (1965)) we considered the record before the Board in the light of the Supreme Court's statement and concluded:

> * * * However, even though we might have decided as an original matter with plaintiff on the balance, the decision of the Supreme Court requires us to go further and uphold the Board's decision if there was substantial evidence to support the Board's decision on the record as a whole. [167 Ct.Cl. at 368]

In other decisions, we have discussed our review of a board's findings of fact. "[T]he scope of our review is narrow and limited." (Sundstrand Turbo v. United States, 389 F.2d 406, 410, 182 Ct.Cl. 31, 38 (1968)). "It is [limited to] whether there was substantial evidence, i. e., such evidence as might convince a reasonable man, to support the conclusion reached by the agency officials." (T. C. Bateson Construction Co. v. United States, 149 Ct.Cl. 514, 518 (1960)). "Where two versions of the facts are equally probable, this court would normally be constrained to favor the version accepted by the ASBCA." (Williamsburg Drapery Co. v. United States, 369 F.2d 729, 733, 177 Ct.Cl. 776, 783 (1966); see also, Dittmore-Freimuth Corp. v. United States, 390 F. 2d 664, 182 Ct.Cl. 507 (1968)). In River

5. The primary guides which define the term substantial evidence are to be found in classic opinions of the Supreme Court:
"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).]
In NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660 (1939), the Court expanded upon its definition:
"* * * [T]his * * * means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. [306 U.S. at 299, 59 S.Ct. at 505]

"Substantial evidence * * * must do more than create a suspicion of the existence of the fact to be established. * * * [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. [306 U.S. at 300, 59 S.Ct. at 505]"
The "weight to be given to the facts and circumstances admitted, as well as the inferences reasonably to be drawn from them, is for the commission [or Board]." F.T.C. v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 63, 47 S.Ct. 255, 258, 71 L.Ed. 534 (1927). See also, Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963).

Construction Corp. v. United States, 159 Ct.Cl. 254 (1962) we considered this question in detail and said:

This issue is very different from the question of whether the Appeals Board was correct. The court may well disagree with the Appeals Board decision but unless the plaintiff has shown the defects described by the Wunderlich Act, there can be no recovery here. [Citation omitted.]

Even though there may have been evidence before the Appeals Board upon which it could have based a decision in favor of the plaintiff, the decision which the board made [in favor of defendant] may still be found to have been supported by substantial evidence, when the whole record is considered. [Citations omitted.]

This does not mean, of course, that the mere fact that there is some evidence to support the administrative decision is sufficient. * * *. Further, the requirement that there be substantial evidence means such evidence as might convince a reasonable man to support the conclusion reached administratively. [Citations omitted; 159 Ct.Cl. at 261.] [6]

■ *Substantial* evidence is evidence which could convince an unprejudiced mind of the truth of the facts to which the evidence is directed. Evidence may be substantial even if it is the sole evidence in a case, e. g., expert testimony.[7] The amount of evidence, however, is not necessarily determinative, e. g., if the only evidence is a series of isolated statements in the record.

■ Reasonable inferences fairly drawn from the evidence are for the administrative tribunal. Where two equally reasonable but contrary inferences might be drawn from the record and each could be sustained as supported by substantial evidence, the one adopted by the Board should be sustained. Moreover, where conflicting testimony is in the record, the Board's preference will, generally, not be disturbed unless we can conclude that the findings are not supported by some evidence which qualitatively and, in appropriate circumstances, quantitatively, can be deemed substantial evidence when the record is viewed as a whole.

■ Whether specifications are factually impossible or commercially impracticable to perform is a question of fact, not of law (Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 181 Ct.Cl. 607 (1967) and should be decided by the Board. However, the ultimate issue is one of law; i. e., is the default excusable because performance was "im-

---

6. See also, Midwest Spray & Coating Co. v. United States, 176 Ct.Cl. 1331, 1333 (1966).

7. The case before us involves a "battle of the experts," similar to J. A. Terteling & Sons, Inc. v. United States, 390 F.2d 926, 182 Ct.Cl. 691 (1968). In reviewing an administrative decision, the administrative tribunal has an opportunity to observe the demeanor of the witnesses, while we look only at "cold records." It follows that, generally, we should accept the administrative evaluation of credibility unless the testimony is inherently improbable or discredited by undisputed evidence or physical fact. Dittmore-Freimuth Corp. v. United States, supra; Chris Berg, Inc. v. United States, 389 F.2d 401, 182 Ct.Cl. 23 (1968) and Ambrose-Augusterfer Corp. v. United States, 394 F.2d 536, 184 Ct.Cl. 18 (1968).

Our statement in National Concrete & Foundation Co. v. United States, 170 Ct. Cl. 470 (1965) is equally pertinent to this case.

"An examination of the record * * * reveals that, although there were differences between the testimony adduced by plaintiff and by defendant, there was substantial evidence upon which the Board's decision was based. See River Construction Corporation v. United States, supra; also see, T. C. Bateson Construction Co. v. United States, 149 Ct.Cl. 514 (1960)." [170 Ct.Cl. at 478]

It is within the Board's province to evaluate and choose between conflicting expert testimony, subject to our review on whether its findings of fact on the basis of all of the testimony can be said to be premised on substantial evidence.

possible" as that legal standard is defined in Natus Corp. v. United States, 371 F. 2d 450, 178 Ct.Cl. 1 (1967).

■ In limited circumstances the court will decide an issue of fact contrary to the finding made by the Board. Generally, we do not consider making such findings unless we first conclude that there is no substantial evidence to support the Board's findings. If an administrative board has failed to make a relevant finding of fact and the evidence relating to this fact questioned is *undisputed*, we may make a *supplementary* finding without returning the case to the board. Analogously, where the evidence is *disputed* but the overwhelming weight of the evidence strongly points to one conclusion of fact, we may make a necessary *contrary* finding without returning the case to the board, to obviate what would otherwise become "an empty ritual [which] has no place in a rational decision-making process". (Maxwell Dynamometer Co. v. United States, supra, 386 F.2d at 870, 181 Ct.Cl. at 631.) Where, however, as in the case before us, after having heard oral argument, we remain unsure of the exact findings made and the legal standard used by the Board (and the evidence is not so overwhelming as to justify our making our own finding) the procedure outlined by the Supreme Court in its trilogy of decisions concerned with Wunderlich Act review [8] leaves no option other than to remand the case to the Board for clarification.

■■ The substantial evidence rule requires a consideration of "the evidence on both sides in order to determine whether it appears that the evidence in support of the administrative decision can fairly be said to be substantial in the face of opposing evidence. * * *

The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole." (Williams v. United States, 127 F.Supp. 617, 619, 130 Ct.Cl. 435, 440–441, cert. denied, 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955)). Where, however, the opposing evidence is *not* overwhelmingly in favor of the opposing view, the view of the facts adopted by the Board, if otherwise proper, will be sustained when supported by the evidence. That is, if there is adequate and substantial evidence to support either of two contrary findings of fact, the one adopted by the Board is binding on the court, whatever our own evaluation of the evidence might be if the case were before us *res nova*. (National Concrete & Foundation Co. v. United States, supra; see also, T. C. Bateson Construction Co. v. United States, supra.)

We now proceed to the question of whether there is substantial evidence to support the Board's findings or, negatively stated, whether there is evidence overwhelmingly contrary to the findings made by the Board and, therefore, there is an absence of substantial evidence to support its conclusions. We find in this case that there is substantial evidence to support the Board's findings, the most important of which is that plaintiff did not prove performance of the contract was either impossible or commercially impracticable.[9]

## II.

The background of this contract is important. It resulted from an effort by the U. S. Army Engineers Waterways

8. United States v. Utah Construction & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); United States v. Carlo Bianchi & Co., Inc., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

9. Because we uphold the Board's decision and find that plaintiff's evidence is not overwhelming, we need not reach the question of assumption of risk decided by the trial commissioner.

Experiment Station, Vicksburg, Mississippi, to overcome two previously unsuccessful designs for a plastic landing mat. In this contract the Army sought to achieve fabrication of the mats by the fiberglass filament winding process. Its purpose in issuing the contract (awarded by formal advertising) was to test the feasibility of producing experimental mats to be used as airplane runways by the filament winding process.

In 1957 the Army Corps of Engineers (ACE) has commenced a development program for plastic landing mats as runway surfacing material to replace the steel mats used in World War II and Korea. The first two designs were designated T–12 and T–13. Each called for a sandwich-type structure approximately 12 feet long and 3 feet wide, to be composed of a light-weight, high-strength plastic core bonded on each side by a laminated, fiberglass cloth facing. The facing on the top side of the core was not joined or connected to the facing on the bottom side of the core and, hence, the edges of the core were left uncovered. In order to form a complete runway surface, it was necessary to connect a large number of these 12′ x 3′ panels. The designs for the panel connector devices proved, under test, to be deficient on both the T–12 and the T–13. In the second design, the T–13, the fiberglass tongue and groove panel connectors used on the T–12 were abandoned and in their place were substituted extruded aluminum panel connectors which were bonded to the facings. Although this substitution was an improvement, it was found that mats built to the T–13 design could not meet the requirement that the aluminum connectors must not break free from the panel when subjected to a pulling pressure of up to 3,000 pounds per square inch. This failure was found to have been caused by the difference in thermal expansion between the aluminum connectors and the fiberglass; one expanded twice as fast as the other when subjected to heat, thus weakening the bond. Other difficulties with compression and shear-ing strengths were corrected, but the connector problem remained. Neither the T–12 nor the T–13 proved satisfactory.

In studying the problem for the purpose of issuing a new contract, ACE's project engineer proposed to bind the aluminum connectors to the core by a process known as filament winding. This is a new precision process (4 or 5 years old) whereby continuous glass strands are threaded through a vat of resin over a form or shape, called a "mandrel," which rotates at high speed. The resin-impregnated glass strands are built up in layers on the mandrel by the winding process, and when the desired thickness is achieved, the product is heat-cured. The fiberglass strands then form a hard surface over the mandrel, and the resulting structure has extraordinary strength characteristics.

The project engineer suggested that if fiberglass strands were wound around the entire landing mat core the aluminum connector problem would be solved. He believed that even if the adhesive bond between the connectors and the fiberglass should fail, the connectors affixed by the filament winding process would remain tied into the edges of the panels. On this analysis he developed the specifications and design drawing for this contract, the T–14 landing mat. Essentially, these specifications were the same as the ones issued for the T–13 except that the filament winding of the core was substituted for fiberglass cloth facings. The core requirements were the same. The design drawing showed the filament winding in both longitudinal and transverse directions around the entire core.

The contemplated filament winding had never been attempted to produce plastic landing mats. Prior to the issuance of invitations to bid, the project engineer consulted experts in filament winding as to the feasibility of his T–14 design. On inquiry, he ascertained that Hercules Powder Company and Lamtex Industries, Inc. were outstanding leaders

in the filament winding business, and he separately conferred with officials of both companies during April 1962. At this time, the experience of the filament winding industry had been confined in large part to winding on a cylindrical mandrel. The T–14 design, however, involved winding on a relatively large rectangular mandrel. The conferees at both Hercules and Lamtex did not believe that this presented any insurmountable problem, and stated that, in their opinion, the T–14 design was feasible. In arriving at these opinions they appear to have relied exclusively on their manufacturing experience in filament winding. No physical tests or laboratory experiments were conducted.

The discussion at Lamtex consumed approximately five hours and covered the background of the T–14 project, the unsatisfactory T–12 and T–13 designs, the difficulties that ACE had encountered including, in particular, the critical shear strength required of the core material by the specifications, and the fact that this would be the first attempt to make landing mats with the filament winding process. The Lamtex official was concerned about the availability of core material which would meet specifications, *and he was advised that Hexcel Products, Inc. (Hexcel) had manufactured satisfactory cores on both the T–12 and T–13 procurements but that they were expensive.* The ACE project engineer also advised him that Raymond Development Industries (Raypan) was interested in furnishing the cores and had indicated that it could develop or supply a core material which met the specifications. The Lamtex official was aware that the ACE representatives were seeking the advice of his company as one of the acknowledged leaders in the filament winding business. Based on all the information given him, he stated his opinion that the specifications and design were reasonable and attainable.

Thereafter, on May 17, 1962, ACE issued invitations for bids. Having been advised by ACE that the Hexcel core material met the strength specifications for the T–13 mat, which were essentially the same as for the T–14 mat, Lamtex sought quotations from Hexcel on its core material. On May 25, 1962, Lamtex telephoned the ACE project engineer stating that they had received a quotation from Hexcel which was quite high, whereupon the ACE engineer reminded Lamtex that Raypan had indicated its interest in furnishing the cores. Lamtex then inquired of Raypan as to its ability to furnish a core material which would meet the T–14 specifications. Raypan responded affirmatively and furnished a price quotation considerably lower than Hexcel's quotation. Relying on Raypan's representations, Lamtex submitted a bid on the T–14 and included therein a notation that the bid was "based on Raymond Development Industries Raypan Core Material."

Five other bidders also responded to the formal advertising. As the lowest responsible bidder, Lamtex was awarded the contract on June 18, 1962, at a fixed price of $59,774.62.[10] The original completion date was November 16, 1962.[11] Lamtex promptly placed its purchase orders with Raypan for the core material and with the Aluminum Company of America for the aluminum connectors. Before any core material was received, it commenced the designing and installation of the special tooling required for the filament winding work. By mid-

10. Bidders had been informed that the quantity of panels to be procured was subject to a limited fund of $60,000, and that the award would be made to the bidder who offered to furnish the largest number of panels within that fund limitation. Lamtex's bid offered the greatest number, i. e., 45 panels. By predicating its bid on the lower priced Raypan core it was able to offer more panels for the limited fund. Other bidders offered to furnish 12, 24, 28, 23 and 35 panels, respectively.

11. After granting several other time extensions, the contracting officer on June 21, 1963 fixed the final completion date at September 1, 1963.

August, 1962, Lamtex had prepared its machines and by early October all of the necessary tooling for the operation of the machines was complete.

The dollar value added by the filament winding process to the value of the core material was approximately 500 percent. The essence of the contract, therefore, was the new bonding technique.

The specifications required the use of a low-weight, high-strength, reinforced plastic material as a core, and stated that the fabrication be done by the filament winding process. The facings of the mats were to be made of continuous filament-wound glass-reinforced plastic laminate, with specified strength and weight characteristics. These requirements included a flatwise compressive strength of 1,000 p. s. i., flexural strength of 50,000 p. s. i., and shearing strength of 700 p. s. i. Certain details of the process were indicated; for example, the number of fiberglass fibers and their directional relationship to the panel. The dimensions of the mat were specified and a maximum weight limitation of 140 pounds was stated. It is important to note that no requirement was included in the specifications for lateral or edge-wise strength across the width or length of the core material or the panel.

Fabrication by application of the winding process to existing core materials was the most difficult aspect of the contract. The plastic core could have been made of polyester, phenolic or epoxy, all of which are substances that could have been purchased. Lamtex was not required to develop its own core.

Early in the contract period it became apparent to Lamtex's project engineer that he might experience difficulty in obtaining core material which met the government's specifications. This was confirmed when Raypan failed to deliver any core material. It could never raise the flatwise compressive strength of its core material to the 1,000 p. s. i. required by the specifications, although its literature had indicated that its material had

this strength and it had originally assured Lamtex that Raypan cores would meet specifications. By December 17, 1962, Lamtex became convinced that Raypan could not produce acceptable core material. It, therefore, canceled its order and placed a new purchase order with Hexcel.

Hexcel was the other core material which had been mentioned by ACE during the pre-award discussions. It had been used on the prior T–13 contract, and *it met all of the government specification requirements*. The Hexcel material was a plastic honeycomb in which the cells ran from the top to the bottom surface. It was different from the truss work construction of Raypan.

Because it began to encounter difficulty in manufacturing a core material which met the specifications, Hexcel asked Lamtex on several occasions to relieve it of its contractual obligation. There is no evidence that Hexcel ever said that it could not produce the core material. Lamtex, however, became seriously concerned as to Hexcel's ability to produce, and ascertained that another supplier, Honeycomb Products, Inc., claimed to have an acceptable core material which Honeycomb would undertake to certify as meeting the specifications. Lamtex took delivery of 11 panels which Hexcel had fabricated, but canceled its order for the remainder.

An order was placed with Honeycomb Products on January 24, 1963. The Honeycomb core material was similar in design to the Hexcel material. Partial delivery of Honeycomb cores was made to Lamtex in February of 1963, together with a certification by Honeycomb stating that the delivered cores met the specifications.

Lamtex proceeded to fabricate landing mats with Honeycomb and Hexcel cores. Subsequently, in April 1963, it became clear that the Honeycomb core material did not meet the 700 p. s. i. shearing strength requirement as stated in the government's specifications. Honeycomb Products finally recognized this strength

deficiency and advised Lamtex that they could satisfy the shearing strength requirement by redipping the material. Lamtex realized that the mat would then exceed the maximum weight limit of the specifications which the ACE refused to change. By April 1963, at the latest, Lamtex knew that Raypan core did not meet the flatwise compressive strength of the specifications, that Honeycomb did not meet the shearing strength required by the specifications, and that only Hexcel core complied with the government's specifications.

Earlier, on December 17, 1962, plaintiff's project engineer requested and was given an extension of time until March 1, 1963. On April 29, the contracting officer wrote to plaintiff seeking an explanation of plaintiff's failure to deliver. In response, on April 30, plaintiff requested a further extension of time until September 1, 1963. It noted that approximately $47,000 had been spent on the contract to date and that it was unable to produce a suitable core material itself within its time and budget limitations. It then said that "based on the above we estimate completion of the contract by September 1963."

At this point plaintiff was still involved in its attempt to obtain a suitable core from Honeycomb. On May 24, the contracting officer granted plaintiff's request and extended the contract but notified plaintiff that its failure to deliver would result in termination.

On June 24, 1963 the mats shipped by Lamtex were rejected for nine specific reasons, substantially all of which were attributable to a bowing caused by the filament winding tension and the thermal expansion differential of the aluminum connectors. Lamtex gave up and made no further effort to fabricate the T–14 mat, whereupon the contract was terminated for default on September 13, 1963.

On October 11, 1963, Lamtex appealed from the contracting officer's decision alleging that it "could not produce the landing mats within the delivery requirements of the contract because satisfactory core material was not available." It contended, accordingly, that the failure to deliver was for causes beyond Lamtex's control and without its fault or negligence so that, as provided by the contract terms,[12] the default termination should be converted into a termination for the convenience of the government.

The Armed Services Board of Contract Appeals (ASBCA) heard the appeal on May 5, 1964. It was devoted essentially to testimony by experts.

There are two sets of requirements with which we are concerned: (1) the physical property requirements for a core material as set forth in the specifications; and (2) the tension and compressive strength requirements of a mandrel (core) which are not stated in the specifications but which are essential for the fabrication process designed by plaintiff to accomplish filament winding. Hexcel core material fulfilled the first set of requirements but, in plaintiff's opinion, it did not meet the second set of filament winding requirements. Raypan core, in contrast, did meet the second set of requirements for filament winding (if its statements as to compressive strength are accurate, a fact which is not known because no Raypan cores were ever delivered or used in fabricating mats), but it did not meet the requirements of the specifications. A core material (Hexcel) which met the government's specifications was available to plaintiff, albeit at a high cost.

The question of whether fabrication was possible turns on the more narrow issue of whether it was either impossible or commercially impracticable to modify or accommodate the filament winding process so as to fabricate the mats re-

---

12. Clause (e) provides that if, after a termination, it is determined that the failure to perform was not the contractor's fault but was due to causes enumerated in subparagraph (c), then the default termination shall be converted to a termination for the convenience of the government.

quired by the specifications. If performance was not possible, plaintiff's default is excused. The burden of proof on this issue is plaintiff's.

The basic difficulty plaintiff encountered in performing the contract, other than obtaining a suitable core, was adapting the available core to its requirements for a mandrel. As discussed above, the filament process involves continuous glass strands which are threaded through a vat of resin over a form or shape, called a "mandrel." The mandrel rotates at a high speed. It must possess structural characteristics that permit it to retain its shape while the strands are wound over it under considerable and uniform tension. Generally, the mandrel for filament winding of cylindrical objects is removed to leave a hollow vessel or case and therefore, it is usually composed of some soluble salt, plaster-of-paris, or other destructible material. The absolute minimum lateral strength estimated by plaintiff for a core material (mandrel) on this contract was 150 p. s. i. The landing mat fabrication for this contract differed from previous contracts in that the core material was the mandrel and it became an integral part of the finished product rather than being removed after the fabrication was accomplished.

With this evidence and the testimony of plaintiff's and defendant's experts on the impossibility question before it, the ASBCA, in its first opinion, concluded:

First, it was contended that the fabrication of the landing mats, in question, by filament winding was impossible. The Government's evidence opposed this view and we have not been persuaded by evidence for the appellant that the appellant's inability to perform in this case should be equated to legal impossibility.

The ASBCA's second opinion concluded that plaintiff has not shown that it exhausted its available expertise and talent and stated:

It is not possible to determine from the record whether or not the manufacture of landing mats in conformity with the specifications was impossible within the existing state of the art or was commercially impracticable. Little weight can be given to the opinion of the Government project engineer to the effect that it was possible, as he was not an expert on filament winding and his opinion was not supported by any experimental data. On the other hand, the evidence adduced by appellant falls far short of establishing that it was impossible or commercially impracticable for a qualified manufacturer to meet the contract requirements.

As explained above, we can overturn the Board's finding (that plaintiff has not sustained its burden to prove that performance was impossible or commercially impracticable) if we find that the evidence before the Board was so overwhelming as to justify only one conclusion, i. e., that plaintiff did prove that performance was impossible or commercially impracticable. It is a close question and the evidence lends some support to both contentions. Consequently, we cannot conclude that the evidence presented by plaintiff is overwhelming when measured against that which defendant presented. We are, therefore, bound under the standards of Wunderlich Act review to accept the Board's conclusion.

The problem facing Lamtex was that during production the Hexcel core crushed slightly in a lateral direction (caused by the winding tension) and it bowed slightly in the flat plane in a lengthwise direction (caused by the thermal expansion differential in heat curing). The Board found that Hexcel exhibited a lateral or edgewise strength of only 30 p. s. i., substantially less than the minimum of 150 p. s. i. which plaintiff required in the production technique it had designed. It found that plaintiff had experimented with reducing the tension to the minimum its project engineer considered consistent with achieving the desired strength requirements. It also

made other experiments with the winding tension and made one attempt to cure at 300° F., the lowest temperature that the Lamtex project engineer considered practical. These attempts were not successful. The Board, however, included in its findings of fact the statements:

11. * * * However, it does not appear that appellant experimented with any other changes in the fabrication processes it had established initially. It does not appear that appellant ever made any change in the tooling for filament winding that it had designed and built before it received delivery of any core material. * * *. Appellant's project engineer recognized that the core material did not have sufficient [inherent] rigidity to resist deformation from the winding tension, and that a solution to the filament winding problem was dependent on giving the core material sufficient rigidity during the filament winding process * * *.

\* \* \* \* \* \*

17. It seems doubtful from the record that appellant made any further effort to solve the filament winding problem after it discovered that Honeycomb Products core material did not comply with specifications. * *.

\* \* \* \* \* \*

20. The record indicates that appellant did not devote a great amount of time and effort to solving the filament winding problem, because it had been unable to develop a satisfactory core material and it was unwilling or unable to pay Hexcel the price necessary to obtain Hexcel core material that met the specifications. Mr. Wand's opinion, expressed at the hearing, was to the effect that it was impossible or commercially impracticable to produce landing mats conforming to the specifications with the use of Hexcel core material conforming to the specifications, but such opinion is not consistent with the position taken by him in June 1963 when appellant expressed a willingness to continue its efforts to produce [an] acceptable landing mat if the Government would reimburse it for the increased cost of procuring Hexcel core material. While Mr. Wand was an expert on filament winding and the Government project engineer was not, nevertheless, little weight can be given to Mr. Wand's opinion that it was impracticable to employ a jig to give the core material sufficient rigidity to resist the winding tension and avoid deformity during filament winding, as his opinion was not based upon any experimental data and appears to be contrary to the view taken by Mr. Medney [Lamtex's Chairman of the Board and General Manager] on 18 April 1963. The record indicates that the principal reason why appellant discontinued its efforts to perform the contract was that it was unable or unwilling to incur the expense of obtaining specification core material [i. e., Hexcel core].

Plaintiff argues that the board failed to find that it redesigned the channel holding and rotating the core material; it designed the tooling to eliminate stress on the panel so as to drive it from both ends; and it experimented with applying a thin skin of glass over the honeycomb material. The testimony states that a particular channel was employed, not that Lamtex redesigned a new channel after it encountered difficulty, and it also states that the tooling designs were those prepared before any of the problems were known. The skin of glass was used, but not in any attempt to achieve rigidity; rather, as plaintiff's witness testified, it was designed to prevent resin from seeping into the core material during fabrication and made the core only slightly more rigid.

The central theme throughout the Board's opinion is that plaintiff has not shown that it made a sufficient attempt to fulfill the contract and thereby prove that, measured objectively, a competent contractor either could not have performed the contract or that performance involved unreasonable and exces-

sive costs. The doctrine of commercial impracticability does not impose the burden of continued experimentation until there is a certainty that success is not obtainable. There must, however, be a showing that the contractor could succeed only if excessive and unreasonable costs were to be expended. It is not, we note, defendant's burden to prove that performance was possible or that a specific alternative was available to plaintiff whereby performance would be achieved.

Plaintiff claims that the design, drawings and specifications of the mats were developed by the Army who thereby impliedly warranted that performance in accordance with the specifications was possible and that such performance would result in a satisfactory product. Defendant's refusal to accept the mats produced in accordance with the requirements of the contract (i. e., filament winding), plaintiff claims, is a breach of contract.[13]

Lamtex was required to produce mats with specific characteristics by a filament winding process over a core material which also had certain required properties. It claims that it was impossible to produce these mats by the filament process because core suitable as a mandrel was not available. Hexcel produced a core which complied with the contract specifications but it had an inherent structural weakness which was important because the filament winding manufacturing method was applied to it. This is the problem of structural integrity of the core material which, by plaintiff's definition, refers to a core with sufficient rigidity to prevent bowing.

Lamtex has stated that it continued to attempt to fabricate the mats until every reasonable possibility of success had been exhausted. The Board, however, found that plaintiff did not prove that such attempts were made. As stated above, it found that Lamtex devoted itself to finding (or manufacturing) a

core suitable to its established manufacturing technique and made little effort to vary the production technique to accommodate a core which possessed all of the structural requirements detailed in the contract specifications. The specifications make no reference to the need for a rigid core material and plaintiff did not indicate that this was an essential part of its production needs, either at the pre-bid discussions or at any other time. In fact, during the contract term, plaintiff never told defendant that its difficulties were caused by the absence of a rigid core.

The Board's findings that plaintiff did not prove impossibility is equally applicable to this alleged breach of contract which is founded on the same claim of impossibility. Without the knowledge that a contractor could not produce the product, we cannot say that this implied warranty has been breached. Plaintiff, the Board found, has not proved that a product conforming to the specification could not be produced without unreasonable and extreme costs. The precise manufacturing process was not stated and plaintiff is obligated to show that he has made every reasonable effort to comply with the specifications. Plaintiff, the Board held, did not prove that it made these requisite reasonable efforts and, as stated above, we are bound to accept that finding.

This is not a case where a product is made in accordance with the specifications and when subsequently subjected to performance tests it is found inadequate. See, Hol-Gar Mfg. Corp. v. United States, 360 F.2d 634, 175 Ct.Cl. 518 (1966). The Army furnished specifications which stated that a filament winding process was required and indicated on its drawings a particular relationship of the fibers to the mat. The intricacies of how to produce the product and under what conditions the filament winding process was to be applied were left to plaintiff.

13. Plaintiff's claim that the Army misrepresented the content of the contract by withholding vital information about the thermal expansion problem was not briefed to the court and we assume that it has been abandoned.

The extent of defendant's warranty was that if a mat were produced which met the physical characteristics of the specifications, it would be satisfactory without regard to whether the mats fulfilled all of the performance tests to which it might later be subjected. The implied warranty cases relied on by plaintiff are inapplicable because they involve contractors who have proved that the specifications could not be met by any method or only by some extreme method, or circumstances where the defendant misrepresents, conceals, or otherwise fails to apprise the contractor of a fact which it, the government, should have or did know, and the contractor did not and could not reasonably have known. See, United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Steel Products Engineering Co. v. United States, 71 Ct.Cl. 457 (1931).

The problem which is fatal to this claim, as it was to the claim based on the provisions of the contract, is that the Board has found that plaintiff did not prove that performance was impossible or impracticable, and we are bound to accept that finding as supported by substantial evidence.

 In conclusion, the Board found that plaintiff's offer of proof was insufficient to show that it could perform only at an unreasonable cost or that it exhausted its available reasonable alternatives in its attempt to achieve performance. We find plaintiff's evidence is not sufficiently overwhelming to justify our concluding that there is no substantial evidence to sustain the ASBCA's finding, to wit, plaintiff has not sustained its burden of proof. Accordingly, we accept the Board's decision and plaintiff cannot recover under the termination provisions of the contract.

Plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted. Plaintiff's petition is dismissed.